Melvin LEWIS, Appellee,

v.

Joseph MAZURKIEWICZ, Warden, Leroy Zimmerman, Attorney General of Pennsylvania, and Ronald D. Castille, District Attorney of Philadelphia County, Appellants.

No. 90–1015.

United States Court of Appeals, Third Circuit.

Argued June 19, 1990.

Decided Sept. 24, 1990.

Elizabeth J. Chambers (argued), Chief, Federal Litigation, Gaele McLaughlin Barthold, Deputy Dist. Atty., William G. Chadwick, Jr., First Asst. Dist. Atty., Ronald D. Castille, Dist. Atty., Philadelphia, Pa., for appellants.

Thomas A. Bergstrom (argued), Philadelphia, Pa., for appellee.

Before GREENBERG, ALITO and WEIS, Circuit Judges.

## OPINION OF THE COURT

ALITO, Circuit Judge:

This is an appeal from a district court order granting Melvin Lewis's petition for a writ of habeas corpus. The district court concluded that Lewis's constitutional right to the effective assistance of counsel was violated by his attorney's decision not to interview and call a potential witness who could have purportedly bolstered a claim of self-defense and that this decision caused sufficient prejudice to necessitate overturning the conviction. We reverse and hold that petitioner failed to show either that his attorney's performance was constitutionally defective or that his case was prejudiced.

### I.

Lewis was arrested in Philadelphia at the scene of a street fight on a Saturday night in March 1981. He was charged in three separate complaints with attempted murder, aggravated and simple assault, possession of an instrument of crime, and conspiracy. According to the police report,[1] three of the participants in the fight, John and Michael Harrigan and John Boland, told the police that Lewis and two other black men had attacked them and that Lewis had stabbed the Harrigans. The arresting officer stated that he saw Lewis with a knife. In addition, the police report showed that a blood stained knife was recovered at the scene and that John Harrigan was treated at a hospital for a scalp laceration that required stitches, as well as stab wounds to the back, side, and both shoulders. The report also showed that Michael Harrigan received hospital treatment for a stab wound of the chest. The Defender Association of Philadelphia was appointed to represent Lewis. After a preliminary hearing, Lewis was bound over for trial.

Represented by an experienced Defender Association attorney, William Stewart, Esq., Lewis stood trial without a jury in July 1981. The prosecution's first witness, John Harrigan, testified as follows. He, his brother Michael, and John Boland were heading for a midnight movie playing at a theater at Fifteenth and Chestnut Streets when one of a group of three black men made a racial comment. After someone in this group, which included Lewis, made a few more remarks, one of the men accompanying Lewis grabbed John Harrigan and jumped on his back. Meanwhile, John Harrigan observed Lewis chasing Michael Harrigan. John Harrigan succeeded in breaking free and chased Lewis. When he eventually reached him, Lewis began striking John Harrigan in the arm. John Harrigan then noticed blood coming through his winter jacket and saw that Lewis had a knife. John Harrigan tried to back off, but Lewis pursued him and slashed him across the head. At this point, the police appeared. John Harrigan was taken to the hospital and received 20 stitches to close his head wound. He also sustained wounds to the back and both arms.

The Commonwealth's second witness, Michael Harrigan, also stated that he, his brother, and John Boland were headed for a movie when someone in Lewis's group began making comments. Michael Harrigan testified that Lewis and his group approached, and "the next thing I remember, they [Lewis and John Harrigan] were fighting on the ground." Then all of the others jumped in, Michael Harrigan stated. After entering the fight, Michael Harrigan related, he noticed that his shirt was soaked

---

1. The report was admitted at the habeas hearing.

with blood, and he fled. On direct examination, Michael Harrigan stated that Lewis had stabbed him, but during cross-examination, Michael admitted that he was not sure who stabbed him.

The Commonwealth's final witness was the arresting officer, Louis Sgro. Sgro testified that on the night of the fight he was driving an unmarked car when he noticed a large disturbance at the intersection of Fifteenth and Chestnut Streets. Sgro stated that he observed Lewis striking another man on the side of the head and saw blood coming from the man's head. After noticing that Lewis had a knife, Sgro said, he gave chase. Sgro testified that he identified himself as a police officer, and told Lewis to drop the knife. When Sgro finally caught up with Lewis, he stated, Lewis dropped the knife, and a struggle occurred, but Lewis was eventually subdued. The officer testified that he recovered the knife (a switchblade), which was introduced into evidence, and saw that it was covered with blood.

Lewis's trial counsel effectively cross-examined the prosecution witnesses, but called no defense witnesses. The court found Lewis not guilty of attempted murder, but guilty of the remaining counts. Lewis was sentenced to concurrent terms of four to ten years imprisonment on the assault and conspiracy charges and five years probation for the weapons offense.

Represented by new counsel, Lewis appealed to the Pennsylvania Superior Court, claiming that trial counsel was ineffective because he failed to interview a potential witness named Walter Miller. According to Miller's signed statement, which was submitted to the Superior Court, Miller was standing near Fifteenth and Chestnut Streets shortly before midnight on the night of the fight when he observed Lewis and two other black men, as well as a group of three white men. Miller stated that the two groups were yelling at each other but that he could not hear what was said. A few minutes later, he stated, a white man and a black man other than Lewis met in the center of the street and began fighting, but Miller could not tell

who started into the street first. Then, according to Miller, the remaining four men began fighting. Miller stated that Lewis was fighting with one of the white men, when one of the black men ran away. According to Miller, the white man who had been fighting with the black man who ran off then began hitting Lewis with a belt buckle. Lewis fled, with two white men chasing him, Miller stated. According to Miller's statement, at some point in this chase, the police arrived, pursued Lewis, and arrested him. Miller stated that he heard Lewis asking the plainclothes officer for identification. Miller also stated he did not see any weapons during the fight. Miller gave his address as 1349 South Markoe Street.

The Superior Court rejected Lewis's ineffective assistance claim. *Commonwealth v. Lewis,* 323 Pa.Super. 618, 470 A.2d 1041 (1984), *appeal denied,* 106 E.D. Allocatur Docket 1984. Stating that "ineffectiveness may be shown by the failure to call a witness whose testimony would be helpful to the defense," the court concluded: "In the instant case, ... Miller's statement provides no support for appellant's argument that he acted in self-defense." The court observed that Miller "could not say who started the fight." The Pennsylvania Supreme Court denied Lewis's request for allowance of appeal. 106 E.D. Allocatur Docket 1984.

Lewis then filed a federal habeas petition, claiming that his constitutional right to the effective assistance of counsel had been violated by trial counsel's failure to interview or call Walter Miller. At an evidentiary hearing before a United States magistrate, Lewis's new attorney called trial counsel, William Stewart, Esq., as his sole witness, and Stewart explained the basis for his decision not to interview or call Miller. Stewart testified that Lewis was first interviewed by a representative of the Defender Association, another attorney named Cotter, on the Tuesday following the Saturday night fight. At that time, Lewis gave Cotter an account of the fight. Cotter's report of Lewis's statement, as read into the record at the hearing, was as follows:

Defendant was alone, someone hit the defendant on the back of his neck and head.... Defendant pulled a stilleto [sic] and stabbed two people. These people hit the defendant first, parens, self-defense. Defendant said there was a girl present who saw this and told the police she did. Defendant stabbed them and then ran to get away from them.... The only witness was a girl who the defendant doesn't know but he heard her tell the police she saw it.... Defendant told us that he was high on alcohol at the time of the arrest ... [a]nd that he was alone.

In late April, Lewis was interviewed by another representative of the Defender Association named Epstein. Epstein's memo stated: "Defendant sticks with his story. Thus waive [jury] trial...." During the interview, Lewis again mentioned the female eyewitness. Also, attached to Epstein's notes was a piece of paper with the name "David Miller" and the address 1349 Marcoe Street.

In June, Stewart met with Lewis and his father. Before the meeting, Stewart had reviewed the police report and a transcript or summary of the testimony at the preliminary hearing, as well as Lewis's prior statements to Cotter and Epstein. At the June meeting, Stewart and Lewis discussed the testimony that Lewis was prepared to give if he took the stand. In addition, Lewis told Stewart that a witness named "Dave Miller" of 1349 Marcoe Street was willing to support his self-defense claim, and Lewis discussed the testimony that Miller could provide.

Based on all this information, Stewart warned Lewis that his claim of self-defense was unlikely to succeed. He specifically mentioned Lewis's "use of deadly force" and observed that John Harrigan's wounds, including a stab wound in the back and another serious stab wound on the head, "contradicted a claim of self-defense under the Pennsylvania statute." Stewart also noted that the question "who started the altercation" was an "unanswered question[ ]" that undermined Lewis's self-defense claim. Furthermore, Stewart noted

that while Miller claimed he never saw a knife, the police had seen Lewis with a knife and had retrieved a bloody knife at the arrest scene. Finally, Stewart noted that Lewis's statement that he was alone when the fight began was inconsistent with the other evidence. After confronting Lewis with these problems, Stewart outlined Lewis's options. First, Stewart advised that Lewis could have a jury trial, take the stand, and call witnesses. Although Stewart felt that the evidence would not support a claim of self-defense under Pennsylvania law, he explained that there was some chance of jury nullification on racial grounds. Stewart added, however, that if Lewis chose this option and was convicted, the trial judge, whom Stewart knew well, would believe that Lewis and his witnesses had lied and would be likely to impose a more severe sentence.

Second, Stewart counselled, Lewis could request a bench trial. Stewart saw little chance of acquittal at a nonjury trial, however, and he felt that Lewis would be "better off not presenting any defense witnesses." If Lewis himself testified, Stewart predicted, "he would be viewed by [the trial judge] as not telling the truth." Likewise, Stewart's judgment was that calling Miller "would do more harm than good." Finally, Stewart advised Lewis that he could plead guilty and attempt to obtain a reduced sentence by entering an alcohol therapy program before sentencing.

Stewart summarized his recommendation to Lewis as follows:

It was my advice to him ... to go for a sentence, preferably with a guilty plea up front. If he did not want to plead guilty ... the next choice would have been to waive the jury trial and put them through their proof and go from there to a sentence....

Stewart testified that Lewis freely selected the strategy of requesting a nonjury trial. In response to a question by Lewis's habeas attorney, Stewart explained that Lewis chose that option "with the realization that he would be convicted, this waiver trial was going to be what we called a slow

guilty plea. He would be convicted and we would go for a sentence."

After hearing Stewart's uncontradicted testimony regarding the pretrial conferences with Lewis, the magistrate issued a Report–Recommendation advising that the habeas petition should be granted. Stating that trial counsel was constitutionally bound to locate and question Miller, the magistrate concluded that trial counsel's representation fell below the constitutional standard set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In addition, the magistrate's report suggested that trial counsel was constitutionally obligated to call Miller as a witness. The magistrate opined:

> [I]t is clear that defense counsel's opinion that the Miller statement was not sufficient to overcome the claim of the Commonwealth that defendant assaulted his victim was not his responsibility to make. It was the factfinder's (the trial judge's) responsibility to draw a conclusion of this sort.

Furthermore, the magistrate suggested that trial counsel contravened constitutional obligations by advising his client to plead guilty. He wrote: "To advise a defendant that he should '.. go for a sentence, and preferably with a guilty plea up front,' is ... legal advice that falls below the standard of *United States v. Baynes*, [687 F.2d 659 (3d Cir.1982)], and *Strickland v. Washington*, [*supra*].

The magistrate expressed the view that Lewis had been "completely confused ... into thinking that he was going to trial with a plea of not guilty when in fact he was pleading guilty slowly." Finally, the magistrate called upon the President Judge of the Court of Common Pleas "to make a vigorous investigation of defense counsel practices" if it is "common knowledge in City Hall" that defendants who demand jury trials received longer sentences than those who waive jury trial and call no witnesses. The magistrate also called upon the Philadelphia District Attorney to conduct a grand jury investigation regarding the waiver of jury trials in the Philadelphia courts.

Turning to the showing of prejudice required under *Strickland* before a criminal conviction may be reversed due to ineffective assistance of counsel, the magistrate explained that prejudice was shown because Miller's statement "provide[d] a factual question as to whom was the aggressor or aggressors at the time of this incident," because Miller's assertion that one of the white men struck Lewis with a belt buckle would have "confronted [the trial judge] with the question of whether [Lewis] used self-defense or exceeded and used excessive defense for his own protection", and because Miller's statement would have corroborated "the defense version that the defendant was attacked by the victim." Finally, the magistrate stated that Miller, "along with others," could have testified "regarding petitioner's reputation for being a peaceable and law abiding citizen."

The district court accepted the magistrate's recommendation without explanation and granted the petition. This appeal followed.

## II.

As the Supreme Court explained in *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064, a defendant claiming ineffective assistance of counsel must meet two requirements to get relief:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*See also United States v. Gray*, 878 F.2d 702, 710–11 (3d Cir.1989).

We will consider each of these requirements in turn. In conducting this examination, we may freely review the district court's conclusions. *United States v.*

*Gray,* 878 F.2d at 703. *See also Strickland v. Washington,* 466 U.S. at 698, 104 S.Ct. at 2070; *Morrison v. Kimmelman,* 752 F.2d 918, 923 (3d Cir.1985), *aff'd,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

## A.  ADEQUACY OF TRIAL COUNSEL'S REPRESENTATION

We turn first to the question whether the performance of trial counsel in this case was so deficient "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064.  Pointing out that "[t]he proper measure of attorney performance" is "reasonableness under prevailing professional norms" (*id.* at 688, 104 S.Ct. at 2065), the Supreme Court has cautioned that "judicial scrutiny of counsel's performance must be highly deferential" and that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*id.* at 689, 104 S.Ct. at 2065).

In addition to these general standards for evaluating ineffective assistance of counsel claims, *Strickland* specifically discussed ineffective assistance claims grounded on defense counsel's pretrial investigation.  The Court explained (*id.* at 690–91, 104 S.Ct. at 2065–66):

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*See also Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986).

The Court further observed that defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation (*id.*).  As the Court put it (*id.* (emphasis added)):

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information. *For example, when facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.*

In the present case, as previously noted, the magistrate concluded that trial counsel provided ineffective assistance because a) he advised Lewis to plead guilty or, as a second alternative, to waive a jury trial, b) he advised Lewis that Miller should not be called as a defense witness at a nonjury trial, and c) he provided this advice and implemented it, with Lewis's consent, even though counsel had not personally interviewed Miller.  By contrast, trial counsel explained at the evidentiary hearing that his conduct was based upon his professional judgment that Lewis's claim of self-defense was unlikely to succeed even with Miller's testimony.  Counsel believed that he possessed sufficient information to reach this judgment without personally interviewing Miller because counsel had read the police report, a transcript or summary of the preliminary hearing, and the notes of Lewis's interview with Cotter and Epstein, and had personally heard Lewis's account of the fight and Lewis's outline of Miller's testimony.  Because counsel believed that Lewis had little chance of acquittal, he advised him to concentrate instead on mitigating his sentence.

In reviewing trial counsel's performance, we will consider three separate questions: first, whether trial counsel's evaluation of Lewis's self-defense claim was reasonable in light of information then available to him; second, whether trial counsel was constitutionally obligated to interview Miller[2] personally before advising Lewis; and

---

**2.**  The magistrate appears to have assumed that    the "Dave Miller" mentioned by Lewis to trial

third, whether trial counsel's advice regarding Lewis's strategic options met constitutional standards.

*Evaluation of the self-defense claim.*

■ We conclude that trial counsel's pessimistic evaluation of the self-defense claim was entirely reasonable in light of the information available to him at the time. Under Pennsylvania law, Lewis's use of a knife to inflict head or neck wounds almost certainly constituted "deadly force," i.e., "force which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury." 18 Pa.Cons.Stat.Ann. 501 (Purdon 1983); *See also Commonwealth v. Cutts*, 281 Pa.Super. 110, 114, 421 A.2d 1172, 1174 (1980); *Commonwealth v. Jones*, 231 Pa.Super. 300, 304, 332 A.2d 464, 465–66 (1974); *Commonwealth v. Presogna*, 221 Pa.Super. 431, 433, 292 A.2d 476, 477–78 (1972). The Pennsylvania Supreme Court has held that the use of deadly force is justified only if a strict three-part test is met. As the Pennsylvania Supreme Court has explained (*Commonwealth v. Brown*, 491 Pa. 507, 512, 421 A.2d 660, 662 (1980) (citations omitted):

> To avail oneself of deadly force for self-protection, three factors must be found to exist. First, the actor must have reasonably believed himself to be in imminent danger of death or serious bodily harm, and that it was necessary to use deadly force against the victim to prevent such harm. Second, the actor must be free from fault in provoking or continuing the difficulty.... Third, the actor must have violated no duty to retreat.

Here, trial counsel had reasonable grounds to doubt whether any part of this test could be met. The Commonwealth's evidence strongly contested the existence of all three requirements. With respect to the commencement and continuation of the fight, the Harrigans testified that Lewis's group made the initial assault and that

Lewis himself pursued and attacked Michael Harrigan and then attacked John Harrigan when he came to his brother's assistance. With respect to whether Lewis had reason to fear death or serious injury, the Commonwealth's evidence strongly suggested that Lewis used deadly force against unarmed opponents. Not only did the Harrigans testify to that effect, but the evidence established that the Harrigans were seriously wounded, and the arresting officer saw Lewis as he apparently stabbed John Harrigan, saw the knife in Lewis's hand, and recovered a bloody knife at the scene. The officer did not see or recover any other weapons. Finally, with respect to whether Lewis violated a duty to retreat,[3] the Harrigans testified that Lewis, far from seeking to withdraw, continued to press the attack. Moreover, this portrayal of Lewis as the aggressor was consistent with the independent evidence that Lewis was the sole armed participant in the fight and that John Harrigan was stabbed in the back.

While the court below believed that trial counsel was constitutionally bound to advance a self-defense claim and call Miller in support of that defense, trial counsel surely had reasonable grounds to doubt that this strategy could succeed whether Miller testified as the sole defense witness or in tandem with Lewis. The option of calling Miller alone presented formidable problems. In the first place, Miller's statement appears legally insufficient to support a claim of self-defense. Miller's statement did not indicate that Lewis or those with him had been attacked first. Apparently for this reason, the Pennsylvania Superior Court concluded that "Miller's statement provides no support for [Lewis's] argument that he acted in self-defense."

Even if Miller's testimony had been legally sufficient, trial counsel had further reasons to doubt whether it would prove effective. Assuming that the trier of fact

counsel was the same person as the "Walter Miller" whose signed statement was later produced. We make the same assumption for purposes of this appeal.

3. Under Pennsylvania law, a private citizen not in his dwelling or place of work may not use deadly force if he "knows he can avoid the necessity of using such force with complete safety by retreating." 18 Pa.Cons.Stat.Ann. 505(b)(2)(ii) (Purdon 1983).

believed Miller's assertion that Lewis was struck by a belt buckle, the trier of fact might well have concluded that Lewis's use of the knife was excessive.[4] Miller's reliability was also subject to easy attack because he stated that he never saw Lewis with a knife, even though he claimed to have witnessed the entire incident, including Lewis's arrest and his statements to the police. Because of the physical evidence and Officer Sgro's testimony that he saw Lewis with the knife and demanded that he drop it, the prosecution could have argued that Miller was either lying to protect his friend or had not accurately observed or recalled what took place. Most important, trial counsel surely had reasonable grounds for predicting that a jury would be unlikely to believe that Lewis acted in self-defense if he did not take the stand himself, particularly in a case where the physical evidence and police testimony tended to refute such a claim.

The second option—calling both Lewis and Miller—was also unattractive. Rather than buttressing each other, the testimony of Lewis and Miller presented glaring conflicts. While Lewis claimed that he was attacked while walking alone, Miller generally corroborated the Harrigans' account that the fight began as a confrontation between a group of three blacks and another group of three whites. Likewise, while Lewis admitted that he possessed a knife and stabbed two of the whites, Miller asserted that he never saw Lewis with a knife. Therefore, had Lewis and Miller both testified, the prosecution could have argued effectively that they refuted each other and that neither should be believed.

Moreover, Lewis's testimony, which would obviously have been critically important, had additional independent problems. Lewis's account, as it appears in the record, did not contain the elements needed to justify deadly force. Lewis does not appear to have claimed that any of the other participants was armed or that they gave him any reason to fear death or seri-

ous injury; he stated simply that he was hit on the back of the head and retaliated by stabbing two of the white men. In addition, Lewis did not claim that he attempted to run away until after he stabbed the two men.

In sum, trial counsel had ample grounds to conclude that a self-defense claim was unlikely to prevail based on the testimony of Miller, Lewis, or both.

*Decision not to interview Miller.*

■ We further conclude that trial counsel acted reasonably and complied with constitutional standards in deciding not to interview Miller. As *Strickland* made clear, trial counsel was not bound by an inflexible constitutional command to interview every possible witness. Instead, counsel was simply required to exercise reasonable professional judgment in deciding whether to interview Miller. "[C]ounsel ha[d] a duty to make reasonable investigations or to make a reasonable decision that made particular investigations unnecessary" (*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066). In addition, counsel was permitted to rely upon what his client had told him in deciding whether a personal interview was needed. As the Court wrote in *Strickland,* "when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether" (*id.*). Thus, the issue in the present case is whether, under all of the circumstances, trial counsel acted reasonably in deciding not to interview Miller. In making this assessment, *Strickland* instructs, we must "apply[ ] a heavy measure of deference to counsel's judgments" (*id.*).

Under this standard, we hold that counsel's decision not to interview Miller satisfied constitutional requirements. Counsel did not interview Miller because Lewis had outlined the testimony that Miller was prepared to give. Counsel had no apparent grounds to doubt the accuracy of Lewis's

---

**4.** See, *e.g., Commonwealth v. Cutts, supra,* (stabbing in the arm with "shiny instrument" excessive response to confrontation by group armed with bats and cue sticks); *Commonwealth v.* *Jones, supra* (stabbing with knife excessive response to "carload of hostile youths" who pelted house and kicked defendant).

outline. In view of the serious weaknesses in the self-defense claim—weaknesses that did not hinge on nuances in Miller's testimony that could have been explored in a personal interview—counsel acted reasonably in deciding not to interview Miller before advising Lewis with respect to this claim. While the reasonableness of counsel's conduct must be judged based upon the circumstances at the time, it is worth noting that neither petitioner nor the court below was subsequently able to identify a single additional piece of useful information regarding the self-defense claim that counsel would have obtained by interviewing Miller.

This case is markedly different from *United States v. Gray, supra,* in which this Court held that defense counsel's performance fell below constitutional standards. In *Gray,* defense counsel made no effort to locate or interview witnesses who could have supported a potentially effective defense that was unsuccessfully advanced at trial. The defendant, charged with possession of a firearm as a convicted felon, claimed that he had taken the weapon in self defense from a man with whom he had been fighting shortly before the police arrived and arrested him. This story was corroborated by the defendant's brother and found some support in the testimony of the arresting officer, who saw the defendant struggling with another man. Although the defendant gave defense counsel the names of additional potential witnesses and told him that the incident had been witnessed by people who lived and worked in the area, defense counsel made no attempt to locate or interview witnesses but instead left that task entirely to the defendant. Even the government conceded that "counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence" (878 F.2d at 712).

In this case, trial counsel's decision not to interview Miller was part of informed and reasonable strategy and thus contrasted with the dereliction found in *Gray.* Here, trial counsel reasonably concluded

that the self-defense claim was strategically inadvisable; in *Gray,* the self-defense claim was promising and was in fact the strategy employed at trial. Here, trial counsel knew from the defendant what Miller would say; in *Gray,* trial counsel lacked comparable information. Here, petitioner has not claimed that trial counsel could have located any witnesses other than Miller; in *Gray,* as noted, additional witnesses might well have been found with reasonable effort.

Nor does *United States v. Baynes,* 687 F.2d 659 (3d Cir.1982), require a holding that trial counsel in the instant case rendered constitutionally deficient performance.[5] *Baynes* held that the defense attorney in that case rendered constitutionally deficient representation by failing to obtain the defendant's voice exemplar and by failing to compare the exemplar with the 12 words on an intercepted telephone conversation that the prosecution attributed to the defendant and that constituted the foundation of the case against him. Read in light of *Strickland*'s subsequent teaching regarding pretrial investigation, *Baynes* does not mean that defense counsel must fully investigate every potential item of evidence even if counsel has reasonable tactical grounds for not doing so. Rather, *Baynes* means that the tactical justifications proffered by defense counsel in that case were not reasonable in light of the particular circumstances of the case. In the present case, as previously explained, trial counsel's tactical justification for deciding not to interview Miller was reasonable and accordingly satisfied the constitutional standards set out in *Strickland.*

*Advice regarding strategy.*

■ Finally, we conclude the trial counsel's advice regarding Lewis's strategy options did not violate constitutional requirements. *Strickland* suggests (466 U.S. at 690–91, 104 S.Ct. at 2065–66) that courts should allow very broad latitude for strategic choices made after adequate investiga-

---

5. We have held that the discussion of prejudice in *Baynes* is no longer good law in light of *Strickland. Morrison v. Kimmelman,* 752 F.2d 918, 922–23 (3d Cir.1985), *aff'd,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

tion. Here, counsel recommended a guilty plea or, as a second choice, a nonjury trial with no defense witnesses because counsel reasonably believed that Lewis's claim of self-defense would fail, because Lewis had no other potential defenses, and because counsel believed based on experience that Lewis would receive a more severe sentence if the judge believed that Lewis or his witnesses had testified untruthfully. *See United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). Although Lewis received a significant prison sentence, this sentence was far below the maximum. In any event, whether or not some other strategy would have ultimately proved more successful, counsel's advice was reasonable and must therefore be sustained.

■ The magistrate's conclusion that trial counsel's strategic advice misled or confused Lewis is unfounded. The magistrate wrote that trial counsel "misled petitioner into thinking that he would receive an appropriate nonjury trial, whereas he really was entering what Mr. Stewart called a 'slow guilty plea.'" Petitioner, however, made no such claim in his petition; nor has he done so on appeal. Furthermore, in the very passage of trial counsel's testimony that contains the phrase "slow guilty plea," trial counsel stated that when Lewis chose the strategy ultimately employed, he did so "with the realization he would be convicted, this waiver trial was going to be what we called a slow guilty plea. He would be convicted and we would go for a sentence."

**B. PREJUDICE**

Even if petitioner could show that trial counsel's performance was constitutionally deficient, petitioner would still have to make an adequate showing of prejudice. *Strickland* explained (466 U.S. at 694, 104 S.Ct. at 2068):

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

■ Petitioner has not made the requisite showing in this case. With respect to trial counsel's decision not to interview Miller, petitioner has failed to show a reasonable likelihood that such an interview would have produced any useful information not already known to trial counsel, much less that any such information would have dictated a different trial strategy or led to a different result at trial. Similarly, petitioner has failed to show any reasonable probability that he would have been acquitted had Miller testified either alone or in conjunction with petitioner. On the contrary, as already discussed, it is very doubtful that petitioner's claim of self-defense would have succeeded in either event.

Finally, the magistrate's suggestion that Miller, "along with others," could have testified as a character witness "regarding petitioner's reputation for being a peaceable and law-abiding citizen" has no foundation in the record. Petitioner did not argue below or before this court that he wanted Miller to testify as a character witness or that Miller was able to do so. Nor does the record show that Lewis did have a reputation for being a "peaceable and law abiding citizen" or that other witnesses were available to testify regarding his reputation. Nor has there been a showing that such testimony would have created a reasonable probability of acquittal.

**III.**

In conclusion, we hold that petitioner failed to meet either prong of *Strickland*'s test for ineffective assistance of counsel claims. The order of the district court granting the petition for a writ of habeas corpus will therefore be reversed.