946 F.2d 236
 Nathaniel MOORE
v.
DEPUTY COMMISSIONER(S) OF SCI-HUNTINGDON; Attorney General
for the State of Pennsylvania; Henry S.
Kenderdine, Jr., D.A. of Lancaster County
Deputy Commissioner of the State Correctional Institution at
Huntingdon and the Attorney General of the
Commonwealth of Pennsylvania, Appellants.
 No. 91-5224.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 3, 1991.
Decided Oct. 8, 1991.
 
 Joseph C. Madenspacher (argued), First Asst. Dist. Atty., Heidi F. Carter, Asst. Dist. Atty., Lancaster, Pa., for appellants.
 James V. Wade, Federal Public Defender, Daniel I. Siegel (argued), Asst. Federal Public Defender, Harrisburg, Pa., for appellee.
 Before STAPLETON, GREENBERG and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 BACKGROUND
 
 1
 The appellants, the deputy commissioner, State Correctional Institution, Huntingdon, and the attorney general of Pennsylvania, appeal from an order of February 28, 1991, granting the petitioner Nathaniel Moore, a state prisoner, a writ of habeas corpus providing for his release from custody unless he is retried. Moore was convicted of first degree murder at a jury trial and his conviction was affirmed on appeal by the Supreme Court of Pennsylvania. Commonwealth v. Moore, 462 Pa. 231, 340 A.2d 447 (1975). The writ was predicated on the district court's findings that Moore's two trial counsel were ineffective and the evidence was constitutionally insufficient to justify the verdict.
 
 
 2
 The case involves the murder of Edward Bruce Wiker by a rifle shot in the early morning hours of September 16, 1972, through a window into the Jefferson Tavern in Lancaster, Pennsylvania. An hour before the shooting, Jehu Johns had been stabbed inside the tavern, but the police quickly arrested two individuals for that offense. After the stabbing, a group of several men, including Moore, one of whom was carrying a rifle, met at a different bar, Graver's (a/k/a the Spanish bar), and then went to the Jefferson Tavern. Several members of the group entered the tavern seeking the men who stabbed Johns, but were told by the bartender that the police had taken them into custody. Moore and Ricardo (Ricky) Mack, another member of the group, then crossed the street away from the tavern. Ricky testified that Moore then loaded the rifle in the alley next to the tavern. At that time Moore fired a single shot through the tavern window from the alley killing Wiker.[1] Ricky testified that he then grabbed the rifle because he was scared, and took it to his brother Daniel Mack's house and then returned to Graver's. The police recovered the rifle from Daniel's house later that morning.
 
 
 3
 Officer Jan Walters of the Lancaster City Police Department, who arrived at the shooting scene, testified that he took a verbal statement from Raymond Lapp, who lived above the tavern and, as a result of that statement, issued a bulletin to be on the lookout for a negro male, approximately five feet six to five feet seven, approximately 20 years of age, with a mustache, goatee, wearing brown or dark colored pants, possibly a white tee shirt, black leather motorcycle-type jacket, and large brown knit beret-type cap.
 
 
 4
 Lapp also testified. He described the group of men and said one had a rifle. He gave the details of the shooting and indicated that Moore looked like the shooter but he could not be certain of that. In particular, Lapp saw the rifle being loaded, aimed and fired into the tavern. Detective Ralph McComsey of the Lancaster City Police Department testified that a search of an apartment where Moore was arrested when he was found hiding in the attic behind a rolled-up mattress, turned up a black leather motorcycle jacket and a brown tam-type hat. Moore had a medium afro and a mustache and goatee at the time of his arrest.
 
 
 5
 Daniel Mack, who was with the group that went to the Jefferson Tavern, testified that he entered the tavern and spoke with the manager about the stabbing. When he left he saw Moore with the rifle. Daniel testified that he told Moore that there would be no shooting that night as the police had the man who stabbed Johns. Moore, however, argued with him and said, "why did we bring the gun if we ain't going to shoot nobody." Daniel, who had just been released from prison, told Moore that "if you shoot the gun and kill somebody that's murder one, I said, I don't want to go to jail again." Daniel testified that he left to go home, hollering "Ricky, don't let him shoot that gun," when he heard the gun go off. He was just turning to get the gun back when the shot was fired. Daniel testified that after the shooting he returned to his wife's home where he found Ricky and the rifle. Then, he and Ricky went to Graver's and met Moore and the others in the group. He testified that just before he left the bar, Moore called him over to the side and stated "don't tell nobody, but I shot the gun."
 
 
 6
 Joseph Nolley, who was present at the times of the stabbing and the shooting, testified that Moore was wearing a black jacket and brown hat. He said that he did not know whether Moore or Ricky had the gun after they crossed the street, but on the day of the shooting he gave a statement to the police that Moore grabbed the gun and fired it through the window.
 
 
 7
 Moore testified in his own defense and said that he was at the tavern when Johns was stabbed, but returned home, changed his clothes, and went to Graver's, where he met Ricky. According to Moore, Daniel arrived at Graver's with a rifle, which Ricky later loaded. Then the group went to the Jefferson Tavern and, after he and Ricky crossed the street, Ricky fired the fatal shot.
 
 
 8
 On several occasions at the trial reference was made to the fact that after Moore was arrested and given Miranda warnings, he would not make a statement about the crime. Moore's failure to make a post-arrest statement was first brought to the jury's attention in the following colloquy between the prosecutor and an investigating officer:
 
 
 9
 Q. After Mary Kathryn Thedford came to the door what transpired?
 
 
 10
 A. We explained to her we were looking for Nathaniel Moore in regards to a murder. And she said that he wasn't there.
 
 
 11
 * * * * * *
 
 
 12
 Q. Did you subsequently find the Defendant in that location?
 
 
 13
 A. We made--we explained that we were going to search the house. We proceeded into the house and he was not on the second floor and youth Officer Styer and myself proceeded to what would be the attic of the home and we found the Defendant in a crouched position hiding behind a rolled up mattress.
 
 
 14
 THE COURT: Just a minute. Found the Defendant in crouched--
 
 
 15
 THE WITNESS: Position, hiding behind a rolled up mattress.
 
 
 16
 * * * * * *
 
 
 17
 Q. How was the Defendant dressed when you found him crouched and hiding behind this mattress?
 
 
 18
 A. In undershorts. No shirt and no other clothing.
 
 
 19
 Q. Before you gained entrance--
 
 
 20
 THE COURT: Only undershorts?
 
 
 21
 THE WITNESS: Yes, sir.
 
 
 22
 THE COURT: Shoes?
 
 
 23
 THE WITNESS: Nothing.
 
 
 24
 BY MR. RANCK [the prosecutor]: (Continuing)
 
 
 25
 Q. Before you gained entrance to this house what, if anything, communication did you make to the persons inside?
 
 
 26
 A. The woman that answered the door, I explained to her that there was a murder, we were looking for Nathaniel Moore and we had information that he lived in the apartment with her.
 
 
 27
 Q. Had any attempts been made to rouse persons inside by means of shouting prior to the door being opened?
 
 
 28
 A. Yes. We had knocked on the door repeatedly--well, first we just knocked. There was no response. We knocked again and yelled, police, and that is when she came down, after about five minutes she came down and answered the door.
 
 
 29
 * * * * * *
 
 
 30
 Q. What was done with the Defendant after you found him hiding?
 
 
 31
 A. Immediately after he was taken into custody he was brought down from the third floor from the second floor level. Detective Simms advised him of his Constitutional Rights by reading from a Miranda Warning card. He was dressed--
 
 
 32
 THE COURT: He dressed?
 
 
 33
 THE WITNESS: He had dressed himself and was handcuffed and brought to the police station.
 
 
 34
 THE COURT: You brought him there?
 
 
 35
 THE WITNESS: Yes, sir.
 
 BY MR. RANCK: (Continuing)
 
 36
 Q. Did any conversation occur at this location with the Defendant other than the reading of the rights?
 
 
 37
 A. He refused to reply or give any answers to anything.
 
 
 38
 Q. He made no--he volunteered no statements?
 
 
 39
 A. He volunteered no statements.
 
 
 40
 Q. And he was taken to the police station, you say. Did any officers return to the location at 144 East Vine Street later that evening--that morning?
 
 
 41
 App. 30 to 35.
 
 
 42
 In its charge the trial court instructed the jury that it could find Moore guilty of first degree murder as an accomplice as well as the actual shooter. Neither of Moore's two trial counsel objected to reference being made to Moore's silence or to the giving of the accomplice instruction, and their acquiescence in these regards was the basis for the district court's findings that they were ineffective.
 
 
 43
 In 1986 Moore, who had already unsuccessfully filed numerous petitions in the state courts seeking post-conviction relief, filed the first of two habeas corpus petitions in the district court. This petition was referred to a magistrate who, on August 21, 1987, made his report and recommendation on the basis of the record, including the transcript of the trial, from the state court. In his report, the magistrate set out the evidence at length. He then said that the issues raised were whether Moore was denied his Sixth Amendment right to effective assistance of counsel when his trial counsel erroneously requested the trial court to charge the jury on accomplice liability, and when the prosecutor improperly questioned McComsey, Detective Herman Simms and Moore himself regarding Moore's post-arrest silence, without objection from Moore's counsel. The magistrate further indicated that there was the additional issue as to whether Moore was denied his due process rights under the Fifth and Fourteenth Amendments because the evidence was insufficient to support the finding of guilt.[2]
 
 
 44
 The magistrate then said that, while the trial court did give an aiding and abetting charge, Moore's counsel did not request it. Nevertheless, the magistrate indicated that the trial counsel were ineffective "for failing to object to the court's jury instructions stating a theory of culpability on [Moore's] part as one who aided and abetted a first degree murder." The magistrate reached this conclusion because, considering the evidence in the light most favorable to the Commonwealth, and assuming arguendo that Moore did not himself fire the fatal shot, he thought that there was no evidence "beyond his presence when another person fired the shot upon which a reasonable jury could have based a verdict that Moore aided and abetted a first degree, premeditated murder."
 
 
 45
 In reaching his conclusion that Moore could not have aided and abetted a first degree murder, the magistrate indicated that if Ricky fired the fatal shot, the most that could have been said about Moore is that he accompanied Ricky knowing that Ricky had the weapon and intended to exact revenge for Johns' stabbing. The magistrate pointed out, however, that under Pennsylvania law mere presence at the scene does not render a person an aider or abettor and he concluded that the record could not support a conclusion either that Moore aided, abetted, or encouraged Ricky to fire a shot or shared an intent with Ricky to kill Wiker. Furthermore, the Commonwealth did not proceed at trial on an aiding and abetting theory. Thus, the magistrate considered Moore's trial counsel were ineffective in not objecting to the aiding and abetting charge as the "grounds for such an objection were fundamental and apparent."
 
 
 46
 The magistrate said that the prosecutor improperly called attention to Moore's post-arrest silence in questioning the two detectives and in cross-examining Moore, in violation of the Fifth and Sixth Amendments, citing Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), and Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in support of this conclusion. He then said that Moore's counsel "did not afford reasonably effective assistance when they let pass without objection several references to [Moore's] post-arrest silence and when they did not object to the jury being charged to consider the factually unsupported theory of Moore's culpability as an accomplice to first degree murder."
 
 
 47
 Of course, the conclusion that the counsel were ineffective was not in itself the basis for relief, for Moore was still obliged to show prejudice, that is, a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). The magistrate, however, concluded that prejudice had been shown and thus Moore was entitled to relief. We need not describe that aspect of his report as we conclude that the counsel were not ineffective.
 
 
 48
 As germane to this opinion, the magistrate next considered Moore's argument that the evidence against him was so insufficient that his conviction violated his due process rights. The magistrate, citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), pointed out that evidence supporting a criminal conviction is constitutionally insufficient if, viewing it in a light most favorable to the prosecution, no rational trier of fact could have found guilt beyond a reasonable doubt. The magistrate said that while it was doubtful that the evidence supported a finding of premeditated, specific intent to commit murder, even assuming that it did, the evidence was insufficient to support a guilty verdict on an aiding and abetting theory. Accordingly, inasmuch as the case was presented to the jury on both bases, Moore was entitled to relief. Thus, the magistrate recommended to the court that the writ should issue unless Moore was granted a new trial.
 
 
 49
 After the appellants filed objections to the report, the district court decided the matter in a memorandum and order of April 22, 1988. While the court indicated that it agreed in substance with the magistrate, it nevertheless concluded that the "petition must be dismissed since unexhausted issues still remain." In particular, the district court indicated that there was "a question as to whether [Moore] has exhausted the sufficiency of evidence claim" with respect to the aiding and abetting issue. Thus, it entered an order denying the petition for failure "to exhaust state judicial remedies." While Moore sought to prosecute an appeal from that order, he was unable to do so as he could not obtain a certificate of probable cause from either the district court or this court.
 
 
 50
 Following the dismissal of his petition by the district court, Moore filed a petition for post-conviction relief under the Pennsylvania Post Conviction Relief Act in the Common Pleas Court of Lancaster County. While counsel (not his counsel on this appeal) was appointed for Moore, he did not diligently prosecute the matter and it thus appears that the state petition is still pending. Accordingly, Moore filed another petition for habeas corpus in the district court which, like his earlier petition, was referred to the magistrate. The magistrate recommended that the second petition be denied, as Moore had still not exhausted his state remedies, but the district court remanded the case to him to determine why the matter was dormant in the state court.
 
 
 51
 On January 3, 1991, the magistrate made a new report and recommendation. He first concluded on the basis of facts developed at an evidentiary hearing, that further effort by Moore to pursue the matter in the state court would be futile.[3] He then incorporated his report of August 21, 1987, by reference and made the following statements which summed up his conclusions:
 
 
 52
 Nathaniel Moore was convicted of first degree murder in violation of his constitutional rights. Defense counsel should have objected to the instructions by the trial court to the jury to consider Moore's culpability as an aider and abettor to a first degree murder, and Moore's Sixth Amendment right to effective counsel was violated by defense counsel's omission. Defense counsel was also ineffective for failing to object to the prosecution's references to Moore's post-arrest silence when Moore was cross-examined.
 
 
 53
 . . . . .
 
 
 54
 Moore is entitled to habeas corpus relief upon his two Sixth Amendment claims, which have been exhausted in state court. He is entitled to habeas corpus relief upon his due process, sufficiency of the evidence claim, which he cannot further pursue in state court because of the circumstances existing there rendering further efforts to exhaust futile.
 
 
 55
 The district court then disposed of the matter by memorandum and order of February 28, 1991. The court noted that the Commonwealth now conceded that further exhaustion of state remedies should no longer be required and the court agreed, citing Burkett v. Cunningham, 826 F.2d 1208, 1218 (3d Cir.1987). The court then indicated in a brief discussion that the comments on Moore's post-arrest silence violated his Fifth Amendment rights contrary to Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618; Wainwright v. Greenfield, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986); and Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. It then held that counsel were ineffective for failing "to object to questions and comments that were not only prohibited by constitutional principles but also likely to prejudice [Moore's] defense." The court then concluded on this point that the failure to object was "detrimental." Furthermore, the court held that the counsel were "ineffective for failing to object to the aiding and abetting charge."
 
 
 56
 The court then dealt with the sufficiency of the evidence issue, stating that while there was "arguably" evidence from which a rational jury could find that Moore fired the rifle, it was "difficult to glean from the record any evidence that he possessed the mental state necessary for a conviction of murder in the first degree." It indicated that no rational trier of the fact could conclude that accomplice liability should attach "for there was nothing in the record from which anyone could decide that the individual who fired the weapon (whoever that might have been) possessed the required mental state for a conviction of murder in the first degree." It then said that it could not be found beyond a reasonable doubt that Moore "had a conscious desire to either bring about or actively participate in the fatal shooting of another." Accordingly, the district court entered an order adopting and approving the magistrate's report, granting the writ of habeas corpus, and providing for Moore's release unless he was retried. This appeal followed.
 
 DISCUSSION
 
 57
 We make two preliminary points with respect to our merits discussion. First, we are in full accord with the district court that Moore should not be required to attempt further to exhaust state remedies as it would be futile to do so. Therefore, we will reach the merits of the appeal. Second, we will exercise plenary review because the district court decided this case, aside from the exhaustion of state remedies issue which is not in dispute, on the basis of the record from the state court and thus we are not reviewing findings of fact made by the district court following an evidentiary hearing. Rather, we are deciding this appeal through the application and interpretation of legal precepts, Carter v. Rafferty, 826 F.2d 1299, 1304 (3d Cir.1987), and we freely review the district court's conclusion regarding the competency of trial counsel. Zettlemoyer v. Fulcomer, 923 F.2d 284, 291 (3d Cir.1991); Lewis v. Mazurkiewicz, 915 F.2d 106, 110 (3d Cir.1990).
 
 Sufficiency of the Evidence
 
 58
 When a petitioner challenges his custody on the ground that there was insufficient evidence to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). Accordingly, the question is not whether we believe that the evidence at trial established guilt beyond a reasonable doubt, but whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. Id. The jury, however, weighs the evidence and we must defer to the jury's resolution of conflicts in the evidence. Id. at 326, 99 S.Ct. at 2793.
 
 
 59
 Pennsylvania's criminal code, at the time of the offense, defined first degree murder as including, inter alia, a criminal homicide by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. See 18 Pa.Cons.Stat.Ann. § 2502 (note) (1983). The district court, while acknowledging that there "arguably" was evidence that Moore was the shooter, concluded that the Commonwealth had not shown that the man who shot the rifle had the requisite intent to support a conviction for first degree murder. In addition, it stated that there was no way that it could be determined that Moore "had a conscious desire to either bring about and actually participate in the fatal shooting of another."
 
 
 60
 We are satisfied that these factual conclusions were erroneous. To start with, we point out that there was more than arguable evidence that Moore was the shooter. Rather, there was direct, compelling evidence that he was that person as we have already set forth. Furthermore the Commonwealth presented evidence that the man who fired the fatal shot, whether it was Moore or Ricky, possessed the requisite level of intent for first degree murder, that is he "specifically intended to kill." Commonwealth v. Weinstein, 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982). See also Commonwealth v. Edwards, 521 Pa. 134, 153, 555 A.2d 818, 828 (1989). Lapp testified that he saw a group of approximately eight men, one of whom was carrying a rifle, approach the tavern. He testified that this man took something from his pocket, perhaps a cartridge, and tried to load the rifle. When he loaded the rifle he raised it, took aim, and fired one shot through the window of the tavern. This testimony is significant because it had to have been obvious to the shooter that the tavern was open for business. Indeed, several of the shooter's companions had just entered the tavern and then left. Thus, there can be no doubt that the evidence supported the conclusion that the shooter willfully, deliberately and with premeditation murdered a patron of the tavern, who happened to be Wiker, to revenge Johns' stabbing.[4]
 
 
 61
 We realize that the magistrate whose report the district court adopted was concerned about whether the shooter could see through the window of the tavern and whether the glass was transparent. But the record clearly demonstrates that the shooter could see inside. McComsey identified photographs of the window taken from inside the tavern and described the scene outside as seen from inside. Inasmuch as it was certainly possible to see from inside to the outside, it is reasonable to infer that it was equally possible to see inside the tavern from the outside. Thus, the evidence supported a finding that the shooter deliberately shot at Wiker, though Wiker was apparently simply a random target who by bad luck just happened to be in the tavern.
 
 
 62
 Significantly, the magistrate stated that "[c]ircumstantially, an inference might be drawn that the shot was fired with an intent to kill from the fact that a high powered rifle was fired into the Jefferson Tavern and the fact that there was animosity among Moore's associates towards persons who did harm to Jehu Johns." We agree and indeed cannot understand how this inference can be avoided. While the magistrate then listed factors which it viewed (though we do not) as undercutting the inference of intent, this amounted to a weighing of the evidence rather than viewing it in the light most favorable to the Commonwealth.
 
 
 63
 In addition to clearly establishing that the shooter, whether Moore or Ricky, intended to kill someone inside the tavern, the evidence presented by the Commonwealth supports the conclusion that Moore in particular had the intent to kill. Moore, after all, asked the fateful question: "why did we bring the gun if we ain't going to shoot nobody." By his conduct he answered his own question.
 
 
 64
 The second aspect of the sufficiency of the evidence argument relates to accomplice liability. At the time of the offense here, the Supreme court of Pennsylvania indicated that under Pennsylvania law:
 
 
 65
 If one aids and abets in the commission of a crime, he is guilty as a principal. One is an aider and abettor in the commission of any crime, i.e. he has 'joined in its commission', if he was an active partner in the intent which was the crime's basic element....
 
 
 66
 Commonwealth v. Rife, 454 Pa. 506, 510-11, 312 A.2d 406, 409 (1973) (quoting Commonwealth v. Strantz, 328 Pa. 33, 40, 195 A. 75, 79 (1937)).
 
 
 67
 Accordingly, we make a two-step analysis to determine if the evidence supports Moore's guilt as an aider and abettor to first degree murder. Moore must have had "the requisite criminal intent" and his conduct "must [have risen] to the level of criminal activity, such that the accused has promoted or facilitated the commission of the crime." Commonwealth v. Potts, 388 Pa.Super. 593, 599-600, 566 A.2d 287, 291 (1989), allocatur granted, 525 Pa. 656, 582 A.2d 322 (1990).[5] Thus, in Rife, the Supreme Court of Pennsylvania held that "[t]here was sufficient evidence of shared criminal intent and activity to find that appellants were accomplices" to manslaughter since they had "[played] principal roles" in the street brawl in which the victim was killed. 454 Pa. at 510, 312 A.2d at 408. See also Commonwealth v. Wilson, 449 Pa. 235, 238, 296 A.2d 719, 721 (1972) (aider and abettor is responsible for criminal acts of another if he shares criminal intent of principal). Of course, mere presence at the scene of the offense is not sufficient to establish culpability as an aider and abettor, nor is presence at the scene in combination with flight from the scene. See Commonwealth v. Goodman, 465 Pa. 367, 350 A.2d 810 (1976); Commonwealth v. Jones, 291 Pa.Super. 69, 72-73, 435 A.2d 223, 225 (1981).
 
 
 68
 In considering the sufficiency of the aiding and abetting evidence, we start from the premise which we have already demonstrated, that the man who fired the rifle, even if not Moore, possessed the requisite intent. We then assume that the jury concluded that Moore was not that man. We must then consider whether in those circumstances there was evidence that Moore shared the shooter's intent. As we have already explained, there was. But we will revisit the issue and point out that the testimony showed that Moore was at the tavern earlier that evening at the time of the stabbing and that the second confrontation came in revenge for the stabbing. Moore went back to the tavern as part of the group seeking to retaliate and he testified that he knew the group had a loaded rifle. Furthermore, we again point out that Daniel testified that Moore argued with him when he told Moore that there would be no shooting, stating "why did we bring the gun if we ain't going to shoot nobody." This willful conduct and statement of Moore's attitude, in light of the obvious risk that the loaded gun might be used, demonstrates Moore's intent to participate in the wrongful conduct of the shooter even if he did not fire the shot himself.
 
 
 69
 Of course, Moore had to participate in the crime to be an aider and abettor but this conduct was clearly demonstrated as there was testimony that Moore was not merely present at the scene and that he did more than just flee. The record shows that Moore carried the rifle at the tavern knowing that it was loaded. Thus, Ricky testified that when he came out of the tavern he saw Moore holding the rifle. Daniel testified that Moore had the rifle in his hands after Daniel left the tavern and Randy Johnson testified that Moore stood in the middle of King Street holding the rifle. Furthermore, Ricky testified that Moore loaded the rifle. We reiterate that the evidence also supports the conclusion that if Moore was not the shooter, he promoted the commission of the offense by asking why the rifle was brought if nobody was to be shot. Accordingly, the Commonwealth presented sufficient evidence that even if Moore was not the shooter, he played a significant role in the murder by (1) accompanying the group knowing the rifle was loaded, (2) urging that the rifle be used, (3) carrying the loaded rifle after members of the group left the tavern, (4) and loading the rifle at the scene. In the circumstances, the evidence was sufficient so that the jury could have found Moore guilty as an aider and abettor beyond a reasonable doubt.
 
 Ineffective Assistance of Counsel
 
 70
 The district court found that trial counsel were ineffective for two reasons. The first was that they failed to object when the court charged the jury on accomplice liability. This point, however, requires no discussion as there would have been no basis for the objection for, as we have explained, the charge was justified on the basis of the evidence.
 
 
 71
 The second reason is more substantial. During the direct examination of two Commonwealth witnesses and during Moore's cross-examination, the prosecutor elicited testimony that Moore had refused to make any statement about the murder after his arrest. Furthermore, the trial court made reference to this testimony in its charge. Of course, Moore who was given his Miranda warning when he was arrested, had no obligation to make any such statement, see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and there can be no doubt that under Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, decided several years after the trial, the testimony about Moore's silence should not have been developed. Of more importance, the Supreme Court of Pennsylvania, prior to the trial in this case, had held that testimonial reference to an accused's silence at the time of his arrest impermissibly violates his Fifth Amendment rights. See Commonwealth v. Haideman, 449 Pa. 367, 296 A.2d 765 (1972); Commonwealth v. Dulaney, 449 Pa. 45, 295 A.2d 328 (1972).[6]
 
 
 72
 Nevertheless Moore's trial counsel did not object to this testimony. Moore understandably cites Boyer v. Patton, 579 F.2d 284 (3d Cir.1978), in support of his position that they were thus ineffective. In Boyer, the petitioner had been tried and convicted in the state court for prison breach. At the trial a prison guard testified without objection that he asked the petitioner, when he was returned, how he got outside and received no reply. In state post-conviction proceedings, the petitioner's trial attorney testified that he could not recall any trial strategy that caused him not to object to the question. Accordingly, as we noted that the testimony was objectionable under Commonwealth v. Haideman, we ordered a writ of habeas corpus granted since the evidence was prejudicial and trial counsel "could offer no reason for his actions." Id. at 288.
 
 
 73
 This case picks up where Boyer left off. Here the trial counsel did have an explanation for not objecting. It is clear that in this case trial counsel were well aware that the references to post-arrest silence were improper. At a state post-conviction proceeding in 1980, seven years after the trial, one of the two counsel who represented Moore at the trial testified that when the evidence of the post-arrest silence was introduced Moore's counsel discussed the matter between themselves and concluded that the less said about it the better and to bring it up "would be more detrimental to Mr. Moore." They felt that if they made a motion for a mistrial it would not be granted and they had "a good shot" for a not guilty verdict.
 
 
 74
 From our perspective today, it would be easy to write that trial counsel should have made an issue of the reference to the post-arrest silence and asked the court to grant a mistrial or in the alternative to instruct the jury to disregard it.[7] But we must approach this matter with the strictures of Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065 (omitting citations) in mind:
 
 
 75
 Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.
 
 
 76
 Here trial counsel were not, in the words of Boyer describing the petitioner's counsel in that case, "languid," "uninspired," or "negligent." 579 F.2d at 288. Rather they made a conscious determination as to how to proceed. Thus, it is not surprising that in the state post-conviction proceeding the testifying counsel was able to give a cogent explanation of the trial strategy.[8] In the circumstances, we cannot find that the trial counsel were constitutionally deficient. The most we can say is that from our post-trial position, deprived of course of the feel of the trial courtroom, we think we might have recommended something else at the trial if we had been there. Under Strickland that is not a sufficient basis to find the counsel to have been ineffective. We can find a Sixth Amendment violation only if we give mere lip service to Strickland.
 
 CONCLUSION
 
 77
 Inasmuch as we find that the evidence was sufficient and counsel were not ineffective, we will reverse the order of February 28, 1991, and will remand the matter to the district court for entry of judgment in favor of the appellants.
 
 
 
 [1]
 The Supreme Court of Pennsylvania on the direct appeal after describing the evidence, pointed out that "completely disinterested witnesses [fixed] Moore as the killer." Commonwealth v. Moore, 462 Pa. at 236, 340 A.2d at 450
 
 
 [2]
 There were other issues as well, but we need not describe them, as they were not the basis for relief and thus are not involved in this appeal
 
 
 [3]
 In fairness to the Common Pleas Court, we point out that a memorandum and order of that court of August 29, 1989, indicates that in the 40 months up to that day Moore had filed 358 pro se petitions and motions. Thus, Moore's case has received a great deal of attention in the state court. Furthermore, it was counsel and not the court who was dilatory
 
 
 [4]
 Perhaps the sheer wantonness of the murder could lead an ordinary rational mind to believe that Moore could not have wanted to kill Wiker. After all, it might be asked, why would Moore think killing Wiker would somehow avenge Johns' stabbing by other persons? Experience teaches, however, that rational minds are simply unable to understand the thinking of violent criminals. Thus, we recognize the lack of logic in what happened but must yield to the actual events in reaching our conclusion
 
 
 [5]
 Commonwealth v. Potts was decided under 18 Pa.Cons.Stat.Ann. § 306 (1983), effective after the murder here, which defines criminal liability for the conduct of another person
 
 
 [6]
 If the only basis for the Miranda objection had been Doyle, counsel could not have been ineffective as they did not have to anticipate future decisions. See Government of the Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir.1989)
 
 
 [7]
 We doubt that a mistrial would have been granted but certainly a curative instruction would have been given if requested and if Haideman and Dulaney were cited
 
 
 [8]
 We note that the district court in its opinion of February 28, 1991, said trial counsel were probably "diligent and effective during the lion's share" of Moore's representation. The magistrate made the same assessment, for in his report of August 21, 1987, he indicated that "[i]t should be emphasized, for the sake of precluding an unfair negative assessment of counsel's [sic ] performance on behalf of Moore, that counsel's [sic ] overall trial performance appears to have been diligent and professional."