**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2881
_____

DAVID RODRIGUEZ

v.

GERALD L. ROZUM; THE DISTRICT OF THE COUNTY OF PHILADELPHIA; THE
ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA,
                                                    Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-11-cv-00393)
District Judge: Honorable Jan E. DuBois
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 13, 2013

Before: SCIRICA, HARDIMAN, and VAN ANTWERPEN, *Circuit Judges*

(Filed: July 1, 2013)
_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, *Circuit Judge*.

After a non-jury waiver trial in the Philadelphia County Court of Common Pleas,

Appellee David Rodriguez ("Rodriguez") was convicted of Murder in the Second

Degree, Aggravated Assault, and Attempted Murder.[1]  He was acquitted of Robbery,

Theft, and various other offenses.  After exhausting his state court remedies, Rodriguez

filed a petition for a writ of habeas corpus in the Eastern District of Pennsylvania,

claiming that he was unconstitutionally convicted based on insufficient evidence.  The

District Court agreed and granted the petition.  For the reasons set forth below, we

reverse.

## I.  The Trial[2]

### A. Steven MacNamee's Testimony

Rodriguez sold marijuana to Steven MacNamee ("Steven") three or four times a

month over a five month period.[3]  Generally, Steven would purchase $400 worth of drugs

at a time.  On February 8, 1998, Steven and Rodriguez arranged to meet to conduct a

drug transaction.  Steven arrived in his white car, while Rodriguez arrived in a red station

wagon, accompanied by Luis Casiano ("Casiano"), who was Rodriguez's codefendant at

trial, and an individual known as "Macho."  Rodriguez and his two companions got into

Steven's car. After seeing the drugs, Steven expressed doubts as to their quality.  The

parties agreed that Steven would take a sample of the drugs to his brother, for whom he

---

[1] These crimes are, and were at the time of trial, codified at 18 Pa.C.S. § 2502(b) (second degree murder); 18 Pa.C.S. §§ 901 and 2502 (attempted murder); and 18 Pa.C.S. § 2702 (aggravated assault).

[2] This Court, like the District Court, views the evidence in the light most favorable to the Commonwealth, as it was the verdict winner at trial.  *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam).

[3] There was a dispute at trial as to the type of drug—the Commonwealth alleged it was marijuana, while Rodriguez and his codefendant, Luis Casiano, alleged it was cocaine. The type of the drug does not affect the disposition of this case.

was purchasing them, and would let Rodriguez know if the drugs were acceptable. Steven said he would be willing to pay $350, as opposed to $400, for the current batch of drugs if Rodriguez could not provide a better product.

Steven later paged Rodriguez to indicate the drugs were not acceptable. Rodriguez called Steven, and said he could not sell the drugs for $350; Steven said he would wait for Rodriguez to acquire a better product. Eventually, after an argumentative conversation, Rodriguez agreed to sell the drugs for the lower price.

Steven brought his brother, David MacNamee ("David") to the meeting. David sat in the front passenger seat, and was tasked with counting the money during the ride to the meeting. Rodriguez again arrived in the red station wagon, accompanied by Casiano and Macho. Rodriguez parked immediately behind the MacNamees' car. According to Steven, Rodriguez, Casiano, and Macho all approached his car, and despite Steven's request that only Rodriguez enter, all three of them got into the back of Steven's car.[4] Macho sat in the rear driver-side seat, Rodriguez sat in the middle seat, and Casiano sat in the rear passenger-side seat. Once in the car, Macho handed the drugs to Rodriguez, who then handed them to David. David gave the money to Rodriguez. David either placed the drugs on the center console between the two front seats, or gave the drugs to Steven who placed them in the center console.

At this point, Rodriguez began speaking Spanish to the individual Steven believed was Casiano. As this was happening, Steven turned forward to start the car, and he heard

_____

[4] At trial, there was a dispute as to whether Casiano ever got into Steven's car—the trial judge found that Casiano had not, and acquitted him of all charges. Whether Casiano was in the car is irrelevant to this matter.

a door open. He then heard three loud "bangs," and as he turned towards the rear of the car, he saw several flashes and a window shatter. The shooting stopped briefly, and Steven saw the individual he believed to be Casiano halfway out of the car, on the rear passenger-side of the vehicle. After Steven said, "You don't have to do this," the individual moved back into the car. During this pause in the shooting, Steven saw a hand reach up to the center console and grab the drugs from it, and saw Rodriguez leaning back against the back seat, holding the drugs in his hand. The individual Steven believed to be Casiano began shooting again, hitting Steven in his right shoulder. The shooter continued to move along the back seat and shot Steven in the face. Before exiting out the rear driver-side door, the shooter fired one more shot, hitting Steven in the shoulder again.

Steven attempted to respond with his own firearm, heard another shot, noticed his brother was bleeding heavily, and drove to the hospital. As he pulled out, he collided with the red station wagon. As it drove past him, Steven saw the station wagon stop to allow the shooter to get in, and then continue to drive away. David died from his injuries while Steven survived, and eventually identified Rodriguez from a series of photo arrays.

### B. Detective Mangoni's Testimony

Detective Mangoni testified regarding a statement Rodriguez gave to police. In that statement, Rodriguez confirmed that he went to sell marijuana to Steven, and that he, Macho, and Casiano got into Steven's car, with Macho in the rear passenger seat, Rodriguez in the middle, and Casiano in the rear driver seat. Rodriguez gave the drugs to Macho, who handed them up front, and David handed the money to Rodriguez. A blue

4

van pulled up behind Steven's car, and Casiano left Steven's car and got into Rodriguez's red station wagon. Macho then pulled out a gun and shot David, and as Rodriguez was leaving the car, Macho began shooting Steven. Rodriguez "took the weed back from Steve before [Rodriguez] got out of Steve's car." (Transcript ("Tr.") 10/6/99 at 139.) Macho kept the money.

After the shooting, Rodriguez drove them to Whitaker Avenue and parked the car, while Macho called a friend from a payphone. Macho's friend arrived soon thereafter, picked up all three individuals, leaving the red station wagon at the payphone, and drove Rodriguez and Casiano to Rodriguez's home. Rodriguez kept the drugs, while Macho kept both the gun and the money.[5]

### C.  Luis Casiano's Testimony

Casiano testified that Rodriguez sold cocaine, not marijuana. Before Casiano and Rodriguez left Rodriguez's house to meet the MacNamees, Macho arrived to speak about some money that Macho owed to Rodriguez. Macho also wanted to buy more cocaine. Rodriguez said he was busy with another customer. Macho asked if he could accompany Rodriguez to the transaction with the MacNamees, and Rodriguez agreed.

According to Casiano, at the meeting Steven said his car would be too crowded if they all got in, and so Casiano went back and waited in the red station wagon while Macho and Rodriguez entered Steven's car. As Casiano waited, a blue minivan with its

---

[5] The Commonwealth also called a deputy Medical Examiner to testify as to the causes of David's death, and the distance from which the firearm was fired that killed him. The Commonwealth called other witnesses, but their testimony pertained solely to the case against Casiano, repeated testimony provided by other witnesses, or provided other evidence not relevant to this matter.

high beams on pulled up behind the red station wagon. He heard three shots from Steven's car, and saw Rodriguez crawl on the ground and run towards the station wagon. Rodriguez exited Steven's vehicle with the drugs in his hands. Rodriguez started the car and pulled up alongside Steven's car as more shots were fired. Macho then got in the station wagon, and they drove away; Rodriguez told Casiano that Macho had shot one of the MacNamees. Casiano testified that the minivan followed them as they drove away. After eluding the minivan, Rodriguez drove them to Whitaker Avenue, and Macho used a payphone to call a friend to pick them up. Rodriguez and Casiano left the station wagon because they were afraid to keep driving it, and got a ride home from Macho's friend.

### D. Rodriguez's Testimony

Rodriguez provided testimony similar to Casiano's regarding the events leading up to the shooting. Once in Steven's car, Macho passed the drugs to Rodriguez, who gave them to David. Rodriguez testified that he was sitting in the rear middle seat of Steven's car. According to Rodriguez, he and Steven disagreed on the appropriate price for the drugs. Rodriguez was exiting the car when he saw a blue minivan pull up; he then heard a gunshot. Rodriguez dove to the ground, and crawled towards the red station wagon. As Rodriguez drove away, he saw Macho get out of Steven's car—Macho told Rodriguez to stop, which he did, and Rodriguez allowed Macho to get into the car. At this point, Rodriguez drove to Whitaker Avenue, waited for Macho to use the payphone, and got a ride home from Macho's friend. Rodriguez took the drugs with him, but claimed the MacNamees had kept the money.

### E. Trial Judge's Decision

6

The trial judge issued her decision from the bench. She found that Macho was the shooter, and found Rodriguez guilty of second degree murder, attempted murder, and aggravated assault based on accomplice liability, because Rodriguez was responsible for Macho's presence in the MacNamees' car. The judge found Rodriguez and Macho were conspirators in the crime of selling drugs, but that Rodriguez did not have the specific intent to kill David MacNamee. The judge found Rodriguez responsible for the drug transaction which resulted in a robbery, and since robbery is one of the enumerated underlying offenses for the purposes of second degree murder, the judge found Rodriguez guilty of second degree murder. The judge specifically stated that she did not believe it was Rodriguez's intent to commit a robbery, and therefore acquitted him of robbery.

## II. Appellate and Post-Conviction Proceedings

On direct appeal, two judges of a three judge panel of the Pennsylvania Superior Court vacated Rodriguez's conviction, based on insufficient evidence.[6] However, the Pennsylvania Superior Court heard the case en banc, and affirmed the conviction without a published opinion. *Commonwealth v. Rodriguez*, 860 A.2d 1134 (Pa. Super. Ct. 2004). In its unpublished opinion, the en banc court found that the trial judge's remarks from the bench were not "findings of fact" but instead were "gratuitous prefatory remarks . . . intended to soften the blow of the guilty verdict and were offered as a courtesy to litigants and onlookers." (Appendix ("App.") at 164.) The court determined that, based on the

---

[6] The Superior Court panel initially found that a defendant cannot be convicted of second degree murder when he is acquitted of the underlying felony, and there is no common design to commit robbery. In so doing, the court relied on the trial judge's statements from the bench regarding Rodriguez's intent. The dissenting judge believed this reliance improper.

7

evidence admitted at trial and the reasonable inferences therefrom, viewed in the light most favorable to the prosecution, there was sufficient evidence to support the conviction. The en banc court mentioned the following as establishing sufficient evidence for accomplice liability: Rodriguez brought Macho, who owed Rodriguez money, to the drug transaction, where the MacNamees would be waiting with money; drove Macho away from the shooting and to a payphone; waited for Macho to call others; and switched getaway cars. (App. at 169.)

The Pennsylvania Supreme Court denied allocatur. Rodriguez filed a Pennsylvania Post Conviction Relief Act ("PCRA") petition, which was denied. This denial was affirmed by the Pennsylvania Superior Court.

Rodriguez filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the Eastern District of Pennsylvania. A Magistrate Judge determined that Rodriguez was not entitled to relief. The District Court disagreed, finding that Rodriguez's conviction violated the Fourteenth Amendment of the Constitution because it was not supported by sufficient evidence. Specifically, the District Court found there was insufficient evidence that Rodriguez had the intent to commit or facilitate the commission of the robbery, and therefore there was insufficient evidence to establish second degree murder via accomplice liability. Appellants timely appealed, arguing that the District Court improperly ignored or discredited pivotal evidence, and misapplied Pennsylvania precedent. Rodriguez, needless to say, disagrees, and argues that the District Court appropriately determined his conviction was supported by insufficient evidence.

8

### III. **Standard and Scope of Review**[7]

"As the District Court did not conduct an evidentiary hearing, our review of its order [granting] habeas relief is plenary." *Johnson v. Folino*, 705 F.3d 117, 127 (3d Cir. 2013). When a petitioner alleges entitlement to habeas relief by challenging the sufficiency of the evidence supporting his state court conviction, federal courts apply a "twice-deferential standard" of review. *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). Under the first part of this standard, "[t]he evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In applying this standard, we consider "*all of the evidence* . . . in the light most favorable to the prosecution" and even if the record "supports conflicting inferences [the reviewing court] must presume—even if it does not affirmatively appear in the record— that the trier of fact resolved any such conflicts in favor of the prosecution." *Jackson*, 443 U.S. at 319, 326.

The second layer of deference only permits a federal court to set aside the state-court conviction if "the decision was objectively unreasonable." *Matthews*, 132 S. Ct. at 2152 (internal citation and quotation marks omitted); *see also Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir. 2011) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless [the

---

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 2241, and 2254(a). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

state court's findings of fact are] objectively unreasonable in light of the evidence presented in the state-court proceeding." (internal citation and quotation marks omitted)). We determine reasonableness based on the record evidence at the time of the state court adjudication. *Blystone*, 664 F.3d at 418.

When reviewing a petition for writ of habeas corpus, alleging an unconstitutional conviction due to insufficient evidence, federal courts do not review the *reasoning* underlying the state court's decision. Instead, we focus on whether the state court's ultimate decision—affirmation of the conviction—was supported by sufficient record evidence. *See* 28 U.S.C. § 2254(d)(1)–(2) (providing that petition for writ shall only be granted if the state court's "adjudication of the claim . . . *resulted in a decision*" that was contrary to federal law or based on "unreasonable determination of the facts" (emphasis added)); *Hollman v. Wilson*, 158 F.3d 177, 180 n.3. (3d Cir. 1998) (noting state appellate court's reasoning was incorrect, but because result was proper, petitioner was not entitled to habeas relief); *see also Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (explaining that when conducting habeas review, "we are determining the reasonableness of the state courts' 'decision,' 28 U.S.C. § 2254(d)(1), not grading their papers").

The fact of a potentially inconsistent verdict does not affect our analysis, and does not affect the constitutionality of the conviction, even where the verdict was rendered by a judge rather than a jury. *Harris v. Rivera*, 454 U.S. 339, 345–48 (1981) (per curiam). "Each count in an indictment is regarded as if it was a separate indictment" so "[c]onsistency in the verdict is not necessary." *Dunn v. United States*, 284 U.S. 390, 393

10

(1932).[8]  Therefore, Rodriguez's robbery acquittal does not preclude us from considering

record evidence establishing his involvement in the robbery when we are reviewing the

sufficiency of the evidence vis-à-vis his felony murder conviction.

Our focus is whether, regardless of the reasoning of the state appellate court and

the robbery acquittal, "the record evidence could reasonably support a finding of guilt

beyond a reasonable doubt." *Jackson*, 443 U.S. at 318.  We "must consider all of the

---

[8] *Dunn* went on to state, "If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other." 284 U.S. at 393.  A later case which upheld *Dunn* noted that this last sentence was no longer correct, because collateral estoppel may be invoked by a criminal defendant. *United States v. Powell*, 469 U.S. 57, 64 (1984).  The Court did not discuss the specific language that "[e]ach count in an indictment is regarded as if it was a separate indictment," *id.* at 62, but it did note that "the *Dunn* rule rests on a sound rationale that is independent of its theories of res judicata, and it therefore survives an attack based upon its presently erroneous reliance on such theories." *Id.* at 64.  Furthermore, several other Courts of Appeals have since invoked *Dunn*'s "separate indictment" language when deciding inconsistent verdict cases. *See United States v. Coutentos*, 651 F.3d 809, 824 (8th Cir. 2011) ("As the Supreme Court has explained, consistency in the verdict is not required because each count in an indictment is regarded as if it was a separate indictment." (citing *Powell*, 469 U.S. at 62)); *United States v. Redcorn*, 528 F.3d 727, 734 (10th Cir. 2008) ("'Each count in an indictment is regarded as if it was a separate indictment.'" (quoting *Powell*, 469 U.S. at 62)); *United States v. Pisman*, 443 F.3d 912, 914 (7th Cir. 2006) (noting that *Powell* "reiterated that each count in an indictment is regarded as if it were a separate indictment").

In addition, this Court stated, in a pre-*Powell* case, that "consistency in the verdicts is not necessary, even though the same evidence is offered in support of each. Each count in the present indictment charges a separate crime and it is enough if there is sufficient evidence to support the jury's verdict of guilty on any one." *United States v. Dolasco*, 184 F.2d 746, 749 (3d Cir. 1950) (citation and footnote omitted).  Two years prior to *Dolasco*, the Supreme Court noted that res judicata applied in criminal as well as civil cases. *See Sealfon v. United States*, 332 U.S. 575, 578 (1948) ("But *res judicata* may be a defense in a second prosecution.  That doctrine applies to criminal as well as civil proceedings and operates to conclude those matters in issue which the verdict determine though the offenses be different." (citations omitted)).

evidence admitted by the trial court" when making this determination. *McDaniel v. Brown*, 558 U.S. 120, 131 (2010).

## IV. Sufficiency of the Evidence

In determining the sufficiency of the evidence, we assess the record evidence in light of the relevant controlling state law defining the elements of the crime or theories of liability. *Jackson*, 443 U.S. at 319, 324 n.16; *see also Orban v. Vaughn*, 123 F.3d 727, 731 (3d Cir. 1997) (stating we analyze such claims "with explicit reference to the substantive elements of the criminal offense as defined by state law").

### A. Relevant Pennsylvania Law

In determining that there was insufficient evidence to sustain Rodriguez's conviction, the District Court erred by ignoring controlling Pennsylvania case law and key evidence in the record.

A person commits second degree murder by committing a criminal homicide "while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. § 2502(b). For purposes of second degree murder, "perpetration of a felony" is defined as "the act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary, or kidnapping." *Id.* at § 2502(d). Therefore, while robbery is an attendant felony for purposes of second degree murder, drug trafficking is not.

In Pennsylvania, a defendant commits robbery if "in the course of committing a theft, he: (i) inflicts serious bodily injury upon another" or "commits or threatens

12

immediately to commit any felony of the first or second-degree." *Id.* at § 3701(1). "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." *Id.* at § 3701(2).

A person is an accomplice in the commission of a crime if: "(1) with the intent of promoting or facilitating the commission of the offense, he: (i) solicits such other person to commit it; or (ii) aids or agrees or attempts to aid such other person in planning or committing it; or (2) his conduct is expressly declared by law to establish his complicity." *Id.* at § 306(c).

In Pennsylvania, a defendant need not be convicted of the underlying felony to be convicted of second degree murder: "[w]hat is required is that the actor be found guilty of a homicide in the progress of committing a felony with sufficient evidence to establish a felony was in process and the killing occurred." *Commonwealth v. Munchinski*, 585 A.2d 471, 483 (Pa. Super. Ct. 1990).

To establish accomplice liability, the Commonwealth "must show by substantive evidence that the accused was an 'active partner in the intent to commit [the crime].'" *Commonwealth v. Wright*, 344 A.2d 512, 514 (Pa. Super. Ct. 1975) (quoting *Commonwealth v. McFadden*, 292 A.2d 358 (Pa. 1972)). "An agreement is not required, as only aid is required" and "[t]he least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice." *Commonwealth v. Graves*, 463 A.2d 467, 470 (Pa. Super. Ct. 1983). Evidence establishing that a defendant was an accessory *after the fact* is alone insufficient to hold

13

an individual liable as an accomplice. *Commonwealth v. McCleary*, 381 A.2d 434, 436 (Pa. 1977).[9]

## B.  The District Court's Analysis

The District Court purported to first address the en banc Pennsylvania Superior Court's decision to determine whether it was unreasonable and to then, independently, analyze the record evidence to assess its sufficiency.  As the latter analysis is dispositive, we focus on it.

## 1.  The District Court Misapplied Relevant Pennsylvania Case Law

The District Court, when conducting its independent review of the record, divided the potential evidence of Rodriguez's intent into two types:  pre-shooting and post-shooting evidence.  The District Court determined there was no pre-shooting evidence of an intent to facilitate or promote the commission of a crime, which is one method of establishing accomplice liability in Pennsylvania.  18 Pa.C.S. § 306(c).  It then concluded that the post-shooting evidence was insufficient, relying on the rule that "mere presence at the scene of the offense is not sufficient to establish culpability as an aider and abettor, nor is presence at the scene in combination with flight from the scene."  *Moore v. Deputy*

---

[9] It would be possible to distinguish *McCleary* from this case.  In *McCleary*, the Pennsylvania Supreme Court rejected the idea that "one who only aids flight without participating in the felony plan *and without knowledge of a death* in the commission of the felony can be held responsible for the killing."  381 A.2d at 436 (emphasis added). Here, the evidence establishes Rodriguez's knowledge of, and participation in, the robbery, and his knowledge of the murder, as it happened mere feet away from him. However, we do not decide this case by distinguishing it from *McCleary*; it is obvious under other, affirmative Pennsylvania holdings that Rodriguez's conviction was supported by sufficient evidence.

*Comm'r(s) of SCI-Huntingdon*, 946 F.2d 236, 244 (3d Cir. 1991) (citing *Commonwealth v. Goodman*, 350 A.2d 810 (Pa. 1976) and *Commonwealth v. Jones*, 435 A.2d 223, 225 (Pa. Super. Ct. 1981)).  As a result, the court found that there was insufficient evidence to establish Rodriguez had intended to commit or facilitate the commission of the robbery of the MacNamees.

As an initial matter, the above quotation, upon which the District Court relies, only partially states the rule in Pennsylvania:  though it is true that presence at and flight from a crime scene, alone, are insufficient to establish accomplice liability, such evidence when combined "with other direct or circumstantial evidence may provide a sufficient basis for conviction provided the conviction is predicated upon more than mere suspicion or conjecture." *Commonwealth v. Rosetti*, 469 A.2d 1121, 1123 (Pa. Super. Ct. 1983) (citation omitted).

A review of the facts of *Rosetti* demonstrates that Rodriguez's conviction was "based on more than mere suspicion or conjecture." *Id.*  In *Rosetti*, the appellant was convicted of criminal trespass under a theory of accomplice liability.  The victim heard a noise at his door, went to answer it, and saw appellant standing twenty feet away. *Rosetti*, 469 A.2d at 1122.  After the victim closed the door, he heard another noise at the door, and then witnessed a second man through a small window in the door. *Id.*  When the victim's phone rang, appellant and his companion fled, and were seen fleeing together, conversing as they ran, and appellant's companion was arrested with a pipe wrench in his possession. *Id.* at 1122–23.  The court found the following facts sufficient to establish accomplice liability:  Appellant was seen outside the home when the crime

began; Appellant's companion was then seen breaking into the home moments later; Appellant and companion fled together; they were seen conversing together in flight a short time later near the crime scene; a pipe wrench was found in possession of Appellant's companion. *Id*. at 1124.

Here, there is sufficient "other direct or circumstantial evidence" of Rodriguez's conduct to establish accomplice liability. First, Rodriguez was not merely present at the crime scene as an innocent bystander: he was an active participant in the robbery, taking the drugs from the MacNamees' after they had given Macho the money and after Macho had begun shooting. Second, Rodriguez did more than simply flee from a crime scene at which he happened to be present: he began fleeing, stopped his escape to assist Macho's flight, drove Macho to a payphone, and then waited while Macho procured new transportation so Rodriguez could abandon his car. Just like the defendant in *Rosetti*, Rodriguez was present when the crime occurred, and he and the principal (Macho) fled together, in concert. Unlike the defendant in *Rosetti*, evidence established that Rodriguez was also an active participant in the crime. Additionally, immediately before the shooting commenced, Rodriguez spoke in Spanish to the shooter, a language not understood by the MacNamees. The timing of this conversation and its incomprehensibility to the victims, the fact that Rodriguez acted in apparent concert with Macho by reaching forward to take the drugs during a brief pause in the shooting, and

16

Rodriguez's and Macho's cooperative flight from the scene, was more than enough evidence, in light of *Rosetti*, to sustain Rodriguez's conviction.[10]

## 2. The District Court Ignored Relevant Pennsylvania Case Law

Aside from misapplying applicable Pennsylvania case law, the District Court also ignored decisions from Pennsylvania courts which establish that the defendant's conduct *after* the underlying felony or murder can provide sufficient evidence of the defendant's intent to commit the underlying felony. *Commonwealth v. Legg*, 417 A.2d 1152, 1154–55 (Pa. 1980); *Commonwealth v. Waters*, 418 A.2d 312, 318 (Pa. 1980).

In *Legg*, the Pennsylvania Supreme Court held that a defendant must have formed the intent to commit the underlying felony *prior to* the killing to sustain a conviction of second degree murder. *Id.* at 1154. However, the court reaffirmed the principle that "the intent to commit the felony when the act of killing occurred [may be] established by an inference arising from *circumstances or acts committed very shortly after the slaying*."

---

[10] The two Pennsylvania cases upon which this Court relied in *Moore* to explain that presence at and flight from a crime scene alone are insufficient to establish accomplice liability provide illustrative applications of the principle.

In *Commonwealth v. Goodman*, Appellant's codefendant was seen coming from the rear of a building holding a box of frozen meat. The codefendant was ordered by police to stand against the wall. Appellant then emerged from the exit and was also told to stand against the wall. The codefendant threw the box at police and fled, Appellant then fled in the opposite direction. Appellant was rearrested thirty minutes later with no inculpatory evidence in his possession. This was insufficient to sustain the conviction for burglary and larceny. *Goodman*, 350 A.2d at 811–12.

In *Commonwealth v. Jones*, Appellant was seen running from an alley approximately one block from the burglarized store. The only other evidence against Appellant was testimony from an officer that no one else was present on the street. 435 A.2d at 225–26.

As explained *supra*, the evidence establishes that Rodriguez's role in the robbery and murder was much greater than those of the defendants in these paradigmatic cases.

17

*Id.* at 1155 (emphasis added); *see also id.* at n.4. In *Waters*, the court determined that the same principle applied when trying to prove a *common design* to commit the underlying felony. 418 A.2d at 318.

This principle was applied in *Commonwealth v. Olds*, 469 A.2d 1072 (Pa. Super. Ct. 1983). In that case, Olds, Bonner, and Allen were driving around town, when Bonner suggested robbing a cigar store. *Id.* at 1074. Olds said he wanted to get something to eat, and the group drove to the cigar store, at which point Allen said, "I'm going to rob the store," to which Olds replied, "yeah right." *Id.* In the store, Olds went to purchase a bag of chips at the register; as he was doing so, Allen followed another customer out of the store, fired a shot, and after the customer offered his wallet, shot the customer twice. *Id.* Olds and Allen jumped in the car as Bonner pulled up, and Bonner dropped them off near Olds's house. *Id.* at 1075. Olds was convicted of second degree murder based on conspiracy liability, which requires the same finding of intent as accomplice liability. *Id.*; *see also Commonwealth v. Anderson*, 402 A.2d 546, 549 (Pa. Super. Ct. 1979) ("The intent required for criminal conspiracy is the same as that required for accomplice liability: 'intent of promoting or facilitating the commission of the offense.'")

The Superior Court affirmed the conviction, noting that the common intent to commit the underlying offense could be "inferred from the circumstances or acts committed either before or shortly after the slaying." *Olds*, 469 A.2d at 1075. The court found "[i]t is especially significant that the three participants arrived at the scene together *and* left together after the crime had been committed. We find, therefore, that the jury in this case was entitled to conclude that appellant was aware of an incipient robbery and

18

performed acts evidencing an agreement to participate therein." *Id.* (citation omitted).
The court noted that this evidence was more than "mere presence at the scene of a crime
[or] mere association with a perpetrator," as that alone would be insufficient. *Id.*

Here, the evidence is far stronger than that in *Olds*. Rodriguez drove Macho, the
shooter, to the location, and Rodriguez watched as Macho shot the MacNamees at close
range. Unlike the defendant in *Olds*, who did not actively participate in the robbery,
Rodriguez took the drugs from the MacNamees as they were being shot. Then, again
unlike the defendant in *Olds* who was merely a passenger, Rodriguez halted his flight
from the scene of the crime to allow Macho to enter his vehicle, drove Macho away from
the scene, and took him to a payphone. Rodriguez then waited while Macho called
another friend and abandoned the getaway car. After securing Macho's and his own
escape, Rodriguez took the drugs while Macho took the money. The evidence regarding
Rodriguez's involvement in the crime, both during and after the shooting, was far greater
than that which supported the conviction in *Olds*, and is precisely the sort of post-offense
conduct which may provide circumstantial evidence of criminal intent under *Legg*.

### 3. The District Court Ignored Dispositive Evidence

This application of Pennsylvania law to the evidence highlights the third error
committed by the District Court: the District Court both ignored key evidence and failed
to view evidence in the light most favorable to the Commonwealth.

19

For example, the District Court determined that the en banc Superior Court erroneously concluded that "Macho took the cash, and Rodriguez took the drugs."[11] (App. at 64.) The District Court found that "the record is devoid of any evidence that 'Macho took the cash'" and that "[t]he evidence was that the drugs were in [Rodriguez's] possession when Macho began shooting, and there is no analysis-worthy evidence as to what happened to the money after the shooting began." (*Id.*) This is a false summation of the record evidence, and appears to involve an impermissible credibility determination.

There is evidence in the record that Macho took the money. Detective Mangoni testified about the contents of statements that Rodriguez gave to the police. According to Mangoni, Rodriguez said that he had taken the drugs from the MacNamees, that Macho took the money, and that Macho kept the money after dropping off Rodriguez and Casiano. (Tr. 10/6/99 at 139 ("Macho had the money with him" after getting into Appellee's car after the shooting); *id.* at 140 ("Macho took [the gun] with him and the money.").) Steven MacNamee also testified that the money had changed hands before the shooting. (Tr. 10/4/99 at 57.)

In addition, evidence established the drugs were *not* in Rodriguez's possession when the shooting began. According to Steven, the drugs had been placed in the center console when the shooting began, and during a brief pause after the first shots were fired, he saw a hand reach up and take the drugs from the center console, and he then turned around and saw Rodriguez holding the drugs in his hand. (Tr. 10/5/99 at 17.) It is

_____

[11] This is but one example of the District Court mistakenly focusing on the state appellate court's reasoning, rather than the record evidence as a whole.

20

unclear why the District Court found this evidence was not "analysis-worthy," or why the District Court found it was able to make such a determination. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.")

The District Court disregards evidence regarding Rodriguez's conduct after the shooting. According to the District Court, "no evidence in the record shows that petitioner's conduct after Macho shot the MacNamees was anything more than fearful flight from a scene at which a customer had unexpectedly shot two men." (App. at 63.) In reaching this conclusion, the District Court failed to discuss the fact that Rodriguez began to drive away, saw Macho, who he had just seen kill two people at close range, and paused to allow Macho to get into his car and thus provide him an avenue of escape. The District Court similarly disregarded the evidence that Rodriguez drove Macho to a payphone, got into a second getaway car with Macho, and abandoned his car, which demonstrates a degree of concert indicative of common or shared intent. *Rosetti*, 469 A.2d at 1122–23; *Olds*, 469 A.2d at 1075.

The District Court also discredited Steven's testimony by, for example, noting that Steven

> testified at trial that the money had exchanged hands before the shooting began. However, this testimony was shown on cross-examination to be inconsistent with Steven MacNamee's statement to police and his preliminary hearing testimony. Moreover, neither the trial court nor the *en banc* Superior Court analyzed or cited Steven MacNamee's testimony.

21

(App. at 64 n. 20 (citations omitted).)  Aside from once again impermissibly focusing on the *reasoning* of the state courts, rather than the record evidence, the District Court weighed the evidence, which the Supreme Court has clearly and vehemently proscribed. *Lonberger*, 459 U.S. at 434; *see also Matthews*, 132 S. Ct. at 2149 (noting lower federal court's decision was "a textbook example of what the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) proscribes: using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts" (internal quotation marks omitted)).

In sum, the District Court ignored several important Pennsylvania cases and disregarded dispositive facts in the record, to wit: Macho owed Rodriguez money; Rodriguez drove Macho to the transaction with the MacNamees; he had Macho rather than Casiano accompany him into the MacNamees' car; he spoke briefly in Spanish to Macho immediately before the shooting began; he took the drugs from the MacNamees as Macho began shooting them, during a brief pause in the shooting; he exited the vehicle and began to drive away, but stopped the car to allow Macho to get in; he drove to a payphone to allow Macho to make a phone call; he waited for Macho to make that phone call, and then for Macho's friend to arrive; he got a ride with Macho's friends and abandoned the car he used to escape the crime scene; Macho's friends drove him home; and he kept the drugs while Macho kept the money.  When this evidence is viewed in conjunction with applicable Pennsylvania case law, it is more than sufficient to establish that Rodriguez acted "with the intent of promoting or facilitating the commission of the [robbery]" by "aid[ing] . . . [Macho] in . . . committing it."  18 Pa.C.S. § 306(c).

22

## V. <u>Conclusion</u>

For the foregoing reasons, the judgment of the District Court is reversed, and the matter is remanded for further proceedings consistent with this opinion.