# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE, )
        )
  Plaintiff,   )
        )
   v.    )  ID No. 0612016202
        )
WAYNE JACKSON,  )
        )
  Defendant.  )

## MEMORANDUM OPINION
### (Corrected)

Defendant was convicted after a jury trial of three burglaries and associated lesser offenses. Although he was found at the time of his arrest with the proceeds of one of the burglaries, the primary, if not exclusive, evidence linking him to the other two was his fingerprints found at the scene. He now brings this Rule 61 motion arguing that both his trial counsel and his appellate counsel were ineffective. Principally he contends that his trial counsel was ineffective in the way he dealt with fingerprint evidence and his appellate counsel's poor performance deprived him of a reasonable likelihood he would prevail on a severance and on a seizure issue. Despite the thorough briefing of his current attorney, the court disagrees with his contentions.

## I. Procedural history

In February 2007, the State charged defendant with nine counts of burglary in the second degree and 22 counts of associated crimes stemming from five incidents occurring in Wilmington. Many of these charges were dropped, and the prosecution eventually proceeded on three counts of burglary-2 and three counts of theft. The three burglaries occurred at separate locations on different days. At the time he was arrested Jackson was found with the proceeds of one of the burglaries. His trial counsel, a Public Defender, filed a motion to sever the two charges for that burglary from the remaining charges. This court considered that motion on the papers and denied it. Trial counsel also moved to suppress evidence seized at the time Jackson was arrested. That motion was also denied. Jackson went to trial in October 2007, and was convicted by a jury on all counts. Because he was an habitual offender Jackson was sentenced to three minimum mandatory terms of eight years for each of the three burglary-2 convictions. He received probation for the associated theft convictions. Jackson appealed his conviction to the Delaware Supreme Court, which affirmed.

Part of this matter focuses on Jackson's direct appeal. As is customary, the Office of the Public Defender assigned a different attorney from its appeals unit to prosecute Jackson's appeal. That attorney, whose conduct is not challenged by Jackson, filed a brief in the Supreme Court in accordance with Rule 26(c). The essence of that brief was that counsel could find no arguable

issues to assert on appeal. The Supreme Court thought there might indeed be arguable issues to present, so it appointed new appellate counsel for Jackson. This counsel will be referred to as "appointed appellate counsel" in this opinion. Appointed appellate counsel filed an opening brief, and after the State filed its answering brief the Supreme Court scheduled the appeal to be heard on the briefs. The Court later affirmed Jackson's conviction in a 20 page opinion.

After his conviction was affirmed Jackson filed a *pro se* Rule 61 motion. The court appointed his current counsel to represent him in the Rule 61 proceedings. During the pendency of the Rule 61 this proceeding was reassigned to the undersigned judge because of the retirement of the trial judge. Thereafter the court expanded the record to include, among other things, affidavits from trial and appellate counsel. Jackson's current counsel and the State then filed briefs, followed by some additional briefing requested by the court on the effect of Criminal Rule 61(i)(4) Jackson's claim relating to the prejudice prong of the test for ineffective assistance of counsel. This is the court's opinion on Jackson's Rule 61 motion.

## II. Facts

The facts are set forth in the Supreme Court's opinion affirming Jackson's conviction. Rather than attempting to re-invent the wheel, the court will simply repeat them here:

On September 25, 2006, Thomas Dykes discovered that his home at 2010 North Broom Street in Wilmington had been burglarized and cordless telephone, laptop computer, digital camera, DVD player, gold bracelet, leather bag, and jar of change were missing. Dykes called the police and Officer Gerald Nagowski of the Wilmington Police Department went to Dykes' home. The screen of a window in the back of the house had been cut near the latches, making that window the burglar's likely point of entry. Nagowski dusted the area for fingerprints and recovered two latent prints.

On October 10, 2006, Timothy Lewis discovered that his home at 2207 Van Buren Place in Wilmington had been burglarized. A cellular telephone, digital camera and one dollar were missing. Lewis called the police and Nagowski went to Lewis' home. Nagowski identified two adjacent windows in the back of the house where the screens had been cut as the likely point of entry. He dusted the area and recovered one latent fingerprint.

On December 20, 2006, Officer Joseph Sammons, supervisor of the Wilmington Police Department's Evidence Detection and Fingerprint Identification Unit, analyzed the latent prints recovered from the Broom Street and Van Buren Place homes. After comparing them to a known print in the department's records, Sammons determined that the latent prints from the Broom Street home matched Jackson's known prints, and that the latent print from the Van Buren Place home compared positively with Jackson's known print. On January 20, 2007, New Castle County Police Officer Alan Herring made a traffic stop on Polk Drive in Edgemoor around 8 p.m. The driver of the car fled on foot and Herring chased him, but could not catch him. Herring radioed for assistance and broadcast a description of the driver as an African–American male, approximately six feet tall, thin build, medium dark to dark complexion, with facial hair, and wearing a golden-brown "puffy" coat. A K–9 unit responded to the scene and the police dog tracked the suspect from the abandoned car, south through Edgemoor, and in the direction of Merchants Square Shopping Center on Governor Printz Boulevard, north of the city of

Wilmington. Several police officers set up a cordon in the area where the driver was likely to flee. Officer Daniel Guzevich stationed himself in the Merchants Square Shopping Center.

Around 8:30 p.m., Guzevich saw a man riding a bicycle enter the shopping center's nearly empty parking lot. The man on the bike resembled the suspect described by Herring. Guzevich described the bicyclist as a tall, thin, African–American man, with facial hair and a dark complexion. The bicyclist was not wearing a "puffy" coat, but Guzevich discounted this difference, because the suspect had fled half an hour earlier and had time to change his clothes. Guzevich decided to question the man and drove toward him.

When the man noticed the police car approaching, he fled immediately. Guzevich turned on the police car's emergency lights and followed him. The man crashed his bicycle into the curb, dropped the bag he was carrying and fled on foot. Guzevich got out of the police car and chased the man on foot, eventually catching up, and physically subduing him and arresting him. The man Guzevich arrested was later determined to be Wayne Jackson. The man who had abandoned his vehicle on Polk Drive was later determined to be Carron Moon. The abandoned vehicle was registered to Terrance Tonic.

During the search of Jackson incident to his arrest, Guzevich found in Jackson's pockets an iPod, a Palm Pilot, a photo of a young girl, a University of Delaware class ring, and twenty dollars. In the bag Jackson had dropped, Guzevich found a laptop computer, another iPod, various cords for the iPod and computer, and a shattered glass coin bank with loose change. When Guzevich turned on the computer, it displayed the names of various members of the Callaghan family. The name "Eugene F. Callaghan" was also inscribed on the inside of the University of Delaware class ring. The police determined that a Eugene F. Callaghan lived at 191 Brandywine Boulevard, about half a mile from where Jackson was arrested. The police went to the Callaghan residence.

5

The Callaghans were not home when the police arrived, but a neighbor called them and they returned home soon after. Eugene Callaghan identified the various items recovered from Jackson as the Callaghan family's computer, Eugene Callaghan's iPod, his daughter's iPod, the family's coin bank, and Eugene Callaghan's class ring. Callaghan also identified the bicycle Jackson was riding as belonging to Callaghan's son and the photo taken from Jackson's pocket as a picture of Callaghan's daughter.

The police later compared Jackson's fingerprints with the fingerprints found at several other homes that had been burglarized in September, October and December 2006. Jackson's prints matched those taken from four other homes that had been burglarized in North Wilmington.

## Analysis

Any Rule 61 analysis must begin with consideration of procedural bars. Unlike most such motions filed in this court, the instant Rule 61 motion is not time barred. However, part of Jackson's motion runs afoul of the prohibition against reconsidering matters which have already been decided.

### A. The procedural bars

Before reaching the merits of a Rule 61 motion the court is obligated to determine if any or all of the claims are procedurally barred.[1] Rule 61(i)(1)[2] bars consideration of a motion filed more than one year after the judgment of conviction is final, which in this case means more than one year after

---

[1] *Younger v. State*, 580 A.2d 552 (Del. 1990)("This Court applies the rules governing procedural requirements before giving consideration to the merits of the underlying claim for postconviction relief.") *Deputy v. State*, 1993 WL 332667 (Del.Super.)("It is well settled the Court must first determine whether Deputy has met the procedural requirements of Superior Ct.Crim.Rule 61(i) before it may consider the merits of his postconviction relief claim.").

[2] This court amended the procedural bars in Rule 61 after Jackson filed his petition. The court will apply the bars in effect at the time he filed his motion. Neither side in this matter has argued the court should apply the new rule.

Jackson's conviction was affirmed on appeal. Jackson's conviction was affirmed by the Supreme Court on July 13, 2009[3] and he filed a *pro se* Rule 61 motion less than one year later, on May 6, 2010. After Jackson filed his *pro se* motion the court appointed counsel for him. Appointed counsel filed a new brief which argued some of the points raised by Jackson in his *pro se* filing and also asserted additional arguments. The court deems counsel's brief to relate back to the original *pro se* filing, and therefore finds that all the arguments raised in that brief are timely.[4]

Another procedural bar, however, is applicable to some of Jackson's arguments. Criminal Rule 61 (i)(4) bars consideration of previously decided issues:

> Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a post conviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.

Jackson argues that Rule 61(i)(5)[5]—which allows colorable constitutional claims to be considered if doing so would avoid a miscarriage of justice—

---

[3]   *Jackson v. State*, 990 A.2d 1281 (Del. 2009).
[4]   Lest this be misunderstood, the court is **not** saying that subsequent Rule 61 motions relate back to the filing of the first motion. The court is also **not** saying that a defendant may file a "placeholder" motion within a year of his or her conviction and then expect that any later arguments will be deemed to be timely. The circumstances of this case are unusual in that the defendant made a genuine attempt to timely raise his post conviction claims and counsel was appointed for him within a year of his conviction becoming final. The fact that the court scheduled the filing of his brief to occur more than a year after the conviction became final is not attributable to Defendant. *See Bey v. State* 402 A.2d 362, 3 (Del., 1979)(" Because defendant did all that was required of him in seeking review; and because his default has been occasioned by court related personnel; his petition for review will not be denied.").
[5]   That part of Rule 61 provides:

> The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that

7

permits this court to hear his barred arguments. But Rule 61(i)(5), on its face applies only to the procedural bars found in Rule 61(i)(1) through (3); the procedural bar of Rule 61 (i)(4) was intentionally excluded from the miscarriage of justice exception. Thus if Jackson is to find any relief from the procedural bar it must be from the "interest of justice" exception imbedded within Rule 61(i)(4) itself.

Last year the Supreme Court summarized the case law defining "interest of justice" as that term is used in Rule 61(i)(4). In *Pringle v. State* the Court wrote:

> We have stated that "[i]n order to invoke the 'interest of justice' provision ... a movant must show that subsequent legal developments have revealed that the trial court lacked the authority to convict or punish [the defendant]." In *Weedon v. State,* we stated that the 61(i)(4) bar does not apply when the previous ruling was "clearly in error" or when "there has been an important change in circumstances, in particular, the factual basis for the issue previously posed." We will not reconsider an issue simply because a defendant has "refined or restated" a claim.[6]

Jackson's claims do not fit within this definition.[7] Jackson argues with considerable fervor that Rule 61 (i)(4) is equivalent to the law of the case doctrine and that in appropriate cases equitable considerations justify ignoring

undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.

[6] 2013 WL 1087633 *3 (Del. Supr.)(footnotes omitted).
[7] Jackson argues there has been a subsequent factual development which warrants reconsideration. He asserts that his assigned appellate attorney was suspended from the practice of law after his direct appeal was affirmed. That suspension was the result of assigned appellate counsel's conduct in other matters. But. the Sixth Amendment issue here is not the performance of assigned appellate counsel in *other* matters; the issue here is his performance in *this* matter. His suspension is therefore not relevant to the issues presented here, and the court does not consider it to be a pertinent new development.

that doctrine. The flaw in this argument is that although Rule 61(i)(4) may be similar to, or even the equivalent of, the law of the case doctrine, it is *not* the same thing. Rule 61 is a creature of the court's rule making powers. Its ancestor, Rule 35, was crafted by this court (and approved by the Supreme Court) under the leadership of Judge Bernard Balick in an effort both to limit the large number of meritless motions for post conviction relief and to preserve Delaware Court's autonomy of Delaware's courts in criminal matters.[8] The narrow exception in Rule 61(i)(4) was a deliberate choice, as was the decision to exempt Rule 61(i)(4) from the miscarriage of justice exception in Rule 61(i)(5). Reading an equity exception into Rule 61(i)(4) would make virtually any previous ruling subject to subsequent review under the guise of "equity"—a result wholly inconsistent with the purpose of Rule61(i)(4). Consequently, although there are similarities between Rule 61(i)(4) and the law of the case doctrine, the court declines to read an equity exception into the former.

The court will discuss the specific application of Rule 61(i)(4) in conjunction with Jackson's claim that his appointed appellate counsel was ineffective.

### B. The standard for showing ineffective assistance of counsel

Ever since the United States Supreme Court's decision in *Strickland v. Washington*[9] the standard for showing ineffective assistance of counsel has

---

[8] *State v. Wright,* 2012 WL 14000932 (Del. Super.) *rev'd on other grounds,* 67 A.3d 319 (Del. 2013).
[9] 466 U.S. 668 (1984).

been a familiar one. First Jackson must show that his "counsel's representation fell below an objective standard of reasonableness."[10] This "requires the use of an objective standard of reasonableness based on prevailing professional norms when evaluating an attorney's conduct. Importantly, [the] task is to 'reconstruct the circumstances of counsel's challenged conduct, and to *evaluate the conduct from the counsel's perspective at the time.*"[11] Second, Jackson must show that, but for the errors of his counsel, there is a reasonable likelihood that the result would have been different. According to the Delaware Supreme Court,

> Even if the defendant successfully demonstrates that his counsel's conduct fell below an objective standard of reasonableness, the inquiry does not end. We will not set aside the judgment in a criminal proceeding if the error had no effect on the outcome. Counsel's error must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." In order to show prejudice, the defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." A reasonable probability of a different result requires a "probability sufficient to undermine confidence in the outcome." Although this standard is not mathematically precise and does not necessarily require a showing of "more likely than not," *Strickland* requires more than a showing merely that the conduct "could have or might have or it is possible that [it would have]" led to a different result. The likelihood of a different result must be substantial, not just conceivable.[12]

---

[10]  *Id.* at 687.
[11]  *Neal v. State* 80 A.3d 935, 942 (Del. 2013)(internal quotation marks omitted).
[12]  *Id.* (footnotes omitted).

10

In some instances Jackson is unable to show his counsel's performance fell below the accepted norm.  In others he cannot show that there is a reasonable likelihood that counsel's performance affected the outcome of the case.

### C.  The performance of Jackson's trial counsel

Jackson makes five arguments, three of which relate to fingerprint analysis, in support of his contention that his trial counsel was ineffective. They are discussed separately.

### 1.  The failure to challenge fingerprint testimony

Jackson argues that his trial counsel was ineffective because he did not seek to exclude expert finger print analysis.  According to Jackson, the science behind finger print analysis is so suspect that an expert offering such analysis would not survive a *Daubert*[13] motion.  But in Delaware, "fingerprint analysis has been tested and proven to be a reliable science over decades for judicial purposes,"[14] and "[t]he overwhelming consensus from federal jurisdictions is that, even when considered in terms of specific *Daubert* factors, the reliability of the technique has been tested in the adversarial system for over a century and has been routinely subject to peer review, and that absent novel challenges, [expert testimony regarding] fingerprint evidence is sufficiently reliable to satisfy Rule 702 and *Daubert*."[15] Defense counsel candidly admitted at oral argument that she is unaware of any court which has precluded finger

---

[13]  *Daubert v. Merrill Dow Pharmaceuticals, Inc,* 509 U.S. 579 (1993).
[14]  *State v. Cole*,  2002 WL 1397452 (Del.Super.).
[15]  *State v. Favela* ,  323 P.3d 716 (Ariz. App. 2014)(internal quotation marks omitted)..

11

print evidence because the science behind it is uncertain.[16] Neither is the court.

As a matter of law the court cannot find trial counsel was ineffective because he failed to advance an argument that has never met with success in an American court. "[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."[17] Consequently the performance of counsel does not fall below the level expected of a reasonably competent attorney merely because counsel does not raise an argument which has never previously been accepted.[18]

## 2. The failure to cross-examine about specific fingerprints

Jackson argues that his trial counsel was ineffective because he failed to cross-examine the State's expert about unidentified fingerprints found on a change jar located in one of the burglarized homes. He also contends that trial counsel should have cross examined the State's expert about whether the age of the Jackson fingerprint exemplar affects the validity of the comparison. The court finds that the absence of such cross-examination does not amount to the ineffective assistance of counsel. Trial counsel conducted extensive cross-

---

[16] When asked at oral argument what Jackson might have achieved if the court had conducted a *Daubert* hearing, Jackson's counsel responded that the court "might have given" a limiting instruction. This falls far short of showing the requisite prejudice.

[17] *Engle v. Isaac,* 456 U.S. 107, 131–34 (1982).

[18] *United States v. Fusaro* 708 F.2d 17, 26 (1st Cir. 1983)("The attorney-client privilege violation was at best a novel claim and failure to spot it does not render counsel's assistance below the range of competence of attorneys.").

examination on fingerprints, and it is well within the reasonable exercise of professional judgment to forego a line of cross examination specific to the unidentified prints on one item. Jackson cites no legal authority or learned treatise to support the notion that the age of the Jackson fingerprint exemplar might affect the validity of the comparison. Insofar as the court is aware, an individual's fingerprints do not change over time. Trial counsel was reasonable, therefore, in omitting such cross examination.

Even if the court were to assume that trial counsel was ineffective by pursuing these lines of questioning, Jackson has not shown the requisite prejudice. With respect to the unknown prints on the change jar, Jackson's fingerprints were found on a window of the burglarized home. Thus, even if trial counsel had developed evidence that the prints on the change jar belonged to the victim or some third person, that evidence would have done little to show that Jackson did not, at least at a minimum, participate in the burglary. And as noted above, there is no reason to believe Jackson could have adduced testimony that the age of the exemplar would call into question the validity of the exemplar. The court is left then with little more than speculation that the omitted cross-examination might have changed the result. This is not enough.[19] Consequently, Jackson suffered no prejudice from the alleged ineffectiveness of trial counsel in this regard.

---

[19] *Morelos v. United States,* 709 F.3d 1246, 1250 (8th Cir. 2013)(rejecting prejudice claim where defendant's "theory of cross-examination prejudice is merely speculative, generally averring if Finney had pursued additional lines of questioning with each of the government's witnesses, it was possible those witnesses would have responded in such a way as to lessen their credibility.").

### 3.  The failure to retain a competent fingerprint expert.

Jackson's trial counsel used the services of a fingerprint analyst retained by the Office of the Public Defender.  The court need not consider whether the analyst was competent and does not do so here. Even assuming that the analyst was not competent, there is nothing to suggest that trial counsel knew of the assumed incompetence and proceeded to use the expert anyway.  The Sixth Amendment assures a criminal defendant assistance of counsel—it says nothing about assistance of experts and thus "there is no separately-cognizable claim of ineffective assistance of expert witnesses...."[20]  To be sure, the guarantee assistance of counsel subsumes a right to access to expert testimony in appropriate cases.[21]  The Sixth Amendment does not require however, and this court will not undertake, a *Daubert*-like inquiry to determine if an expert consulted by defense counsel was "qualified."  The United States Supreme Court disposed of the notion the Constitution requires such an inquiry earlier this year:

> We wish to be clear that the inadequate assistance of counsel we find in this case does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of "strategic choic[e]" that, when made "after thorough investigation of [the] law and facts," is "virtually unchallengeable." We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired. The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made

---

[20]  *Poyner v. Murray,* 964 F.2d 1404, 1419 (4th Cir.1992).
[21]  *See Ake v. Oklahoma ,*470 U.S. 68 (1985).

available to him—that caused counsel to employ an expert that *he himself* deemed inadequate.[22]

Suffice it to say that Jackson must show at a minimum that his counsel retained expert knowing the expert was not qualified, or trial counsel was deliberately indifferent to the expert's qualifications.

In the instant case trial counsel consulted with a fingerprint analyst who has been retained by the Office of the Public Defender for the purpose of providing expert assistance to lawyers in that office. That consulting expert was a former Wilmington Police Officer who was trained and experienced in fingerprint matters. He advised Jackson's trial counsel that the State's analysis of the fingerprint evidence was correct. Notably Jackson has offered no evidence to contradict this conclusion. The court therefore has no basis say that the expert was unqualified, much less trial counsel knew that the expert was unqualified (if indeed he was). Nor can the court say that trial counsel was deliberately indifferent to his qualifications.

### 4. The failure to conduct a proper investigation.

Jackson argues that his counsel was ineffective because he did not interview or investigate someone named "Boyce" who apparently was a possible suspect in other burglaries taking place in or around Wilmington. The court notes that under certain circumstances the failure to interview a witness can amount to the ineffective assistance of counsel. By the same token, defense

---

[22] *Hinton v. Alabama,* ___U.S. ___, 134 S.Ct. 1081 (2014).

counsel need not interview every possible witness brought to his or her attention. "[T]rial counsel [i]s not bound by an inflexible constitutional command to interview every possible witness. Instead, counsel [i]s simply required to exercise reasonable professional judgment in deciding whether to interview [a witness]."[23]

Jackson has not advised the court of any circumstance which should have prompted trial counsel to interview "Boyce." At most he says the police apparently suspected Boyce in some burglaries occurring in or around Wilmington. Without more, Jackson's trial counsel had no constitutional obligation to track down and interview "Boyce." In 2006 (the year when Jackson's crimes took place) there were 6420 reported burglaries in the State[24] and Jackson has not pointed to anything which would make this one stand out. The court cannot therefore say that trial counsel's failure to interview "Boyce" amounts to a Sixth Amendment violation.

But even if trial counsel were obligated to interview "Boyce," there is nothing in the record to show that Jackson was prejudiced by counsel's failure to do so. Jackson has provided no information about what exculpatory evidence "Boyce" would have given trial counsel. As a practical matter, of course, it is questionable whether "Boyce" (assuming he could be found) would even speak to trial counsel, and it is even less likely that he would admit committing a crime to trial counsel. The court is therefore left with nothing but speculation about the impact of the failure to interview "Boyce" and therefore

---

[23] *Lewis v. Mazurkiewicz,* 915 F.2d 106, 113 (3d Cir.1990).
[24] State of Delaware Document number 10-0208 100302.

the court cannot say that it is reasonably probable that the result of Jackson's trial would have been different if "Boyce" had been interviewed.

### 5. The failure to properly present the severance argument

Jackson contended at trial and on appeal that this court should have severed charges relating to one of the burglaries. He is correct that Rule 14 of this court permits the court to sever joined offense into separate trial if "it appears that a defendant will be prejudiced by the joinder of offenses." The prejudice must be specific, either:

(1) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; or

(2) the jury may use the evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; or

(3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges.[25]

He is incorrect, however, in asserting his trial counsels' performance did not meet the constitutional minimal standards required of his counsel.

Jackson contends that his trial counsel was not present for oral argument and, as a result, the matter was decided on the written argument. Trial counsel explains (understandably) that the schedules of Public Defenders require that they be more than one place at the same time. In order to

---

[25] *Wiest v. State,* 542 A.2d 1193, 1195 (Del. 1988).

17

accommodate the demands of the court, assistant public defenders often "cover" for one another on routine matters such as this motion to sever. Trial counsel reasonably relied on this practice and passed off the scheduled argument to a colleague. Jackson also fails to make any showing that he was prejudiced by the fact that this court considered his motion to sever on the papers. The State correctly points out that Jackson never had a right to oral argument in the first place, and this court decides many matters on the papers.

Jackson also argues that his trial counsel did a poor job of articulating the reasons why Jackson would be prejudiced by the joinder. The court finds that trial counsel correctly identified the legal issues implicated in a motion to sever and made plausible arguments on his client's behalf. The Sixth Amendment is not a vehicle for defendants to attack their convictions simply because someone after the fact thought of a better argument:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful. Fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy.[26]

---

[26] *Strickland*, 66 U.S. at 689.

Thus, the fact that Jackson "could imagine a handful of arguments his counsel might have made does not render his counsel's performance deficient." [27]

### D. The performance of Jackson's appellate counsel

Jackson argues that the performance of his appointed appellate counsel on his direct appeal fell below the minimum standard expected of Delaware lawyers. Judging from the appellate record, appointed appellate counsel put forth little effort, and apparently exercised no professional judgment to speak of when prosecuting Jackson's appeal. Despite the sub-par performance of appointed appellate counsel, this court concludes that Jackson has not shown a reasonable probability that, but for appointed appellate counsel's mistakes, there would have been a different result on appeal. Thus, notwithstanding the apparent lack of effort by his appellate counsel, Jackson is not entitled to relief.

### 1. Jackson's representation on appeal

As just stated, the court finds that Jackson has not shown prejudice resulting from his appointed appellate counsel's performance. Ordinarily the court could then dispose of the Sixth Amendment claim without considering whether counsel's performance was up to constitutional standards. In this case, however, Jackson asserts that his appointed appellate counsel's performance was so deficient that it amounted to a complete denial of counsel. This being the case, according to Jackson, he need not show prejudice in order

---

[27] *United States v. Burkley,* 370 Fed.App'x. 899 (10th Cir. 2010).

to make out a Sixth Amendment violation. The court agrees that prejudice is presumed when a defendant has no counsel or the functional equivalent of no counsel. Accordingly, it must therefore examine appellate counsel's performance in order to determine if it is the equivalent of a complete absence of representation.

Jackson was represented at his trial by the Office of the Public Defender. After Jackson was convicted, his Public Defender perfected an appeal to the Supreme Court. Thereafter, the Office of the Public Defender filed a brief pursuant to Supreme Court Rule 26(c) in that court. The author of that brief represented to the Supreme Court that he could find no meritorious issues to argue on appeal. In many instances such as this the Supreme Court resolves an appeal on the basis of the so-called Rule 26(c) brief and any *pro se* supplementation by the defendant. In the case of Jackson's appeal, however, the Supreme Court took the unusual step of appointing new appellate counsel for Jackson, thus suggesting the possibility the Supreme Court was concerned that Jackson may have meritorious issues to raise on appeal.

It is difficult to discern what, if any, effort or independent thought appointed appellate counsel put into his representation of Jackson. The Statement of Facts in the opening brief filed by appointed appellate counsel was nothing more than a verbatim copy of the Statement of Facts in the Rule 26(c) brief prepared by previous appellate counsel. The two arguments contained in the brief were little better. Both got off to a bad start when appointed appellate counsel cited to the wrong standard of review. As would be

20

expected in a competent brief, neither argument contained an examination of the trial court's ruling and an explanation why it was wrong. Both arguments are remarkable in that they were perfunctory, at best. The first (in which appointed appellate counsel argued that charges should have been severed) was--save for a handful of immaterial changes--a verbatim copy of the unsuccessful argument filed in this court by Jackson's trial counsel. The second argument (that evidence should have been suppressed) was cryptic and contained no meaningful argument. The only citations were to opinions standing for widely accepted general principles which are a given in search and seizure matters. The argument contained no citations to opinions which could be considered even remotely specific to the issue raised in the brief. The brief is also remarkable in that it did not contain any real analysis of this court's rulings or any attempt to explain why they were wrong.

Appointed appellate counsel's poor performance was not limited to the brief he filed. The record strongly suggests the possibility that he misled Jackson about what was happening in the Supreme Court. While Jackson's appeal was pending on May 18, 2009 the Clerk of the Supreme Court sent a routine form letter to counsel in Jackson's appeal which in its entirety:

> Pursuant to Supreme Court Rule 16(a), you are advised that the Court has now instructed that the above appeal be considered to be under submission for decision as of Wednesday, June 17, 2009.

The notice says nothing about a reply brief. An appellate attorney, even those with little experience in the Delaware Supreme Court, would know that that Court routinely sets argument/submission dates before the filing of the Reply

21

Brief.[28]  There is simply nothing in the notice which would lead a competent attorney to believe the Court was prohibiting the filing of a reply brief. Nonetheless, appointed appellate counsel wrote to Jackson advising him that the Supreme Court had notified him that no reply brief would be allowed on Jackson's behalf.  Appointed appellate counsel told a different story in an affidavit filed in these Rule 61 proceedings.  Here, he told this court that he chose not to file a reply brief because there was "nothing new" in the State's answering brief.  No mention is made in counsel's affidavit of being misled by the Supreme Court's May 18 notice.

Appointed appellate counsels' ostensible belief that there was nothing in the State's answering brief which required a reply brief is another example of sub-standard representation.  Contrary to what appointed appellate counsel had to say, the State's answering brief called for some sort of reply.  In that brief, the State correctly noted:

> In order to determine whether the stop was proper, the Court must first determine at which point a seizure occurred.  * * * In this case, the answer hinges on whether the issue is examined under the Fourth Amendment to the United States Constitution or Article I, sec. 6 of the Delaware Constitution. **Neither in his motion to suppress nor now on appeal does the defendant specify on which constitution his challenge is based.**[29]

The court recognizes there was likely little that appointed appellate counsel could say in reply.  The Supreme Court disdains sandbagging in reply briefs

---

[28]  Supreme Court  Standard Operating Procedure V(1)(i).
[29]  State's Br. In No. 133, 2008 (emphasis added; internal citation omitted).

22

and therefore it would have been difficult to address the issue for the first time in a reply brief. Moreover, appointed appellate counsel's hands were likely tied, because the state constitutional argument had never been presented below, and it is unlikely that the Supreme Court would have considered it in the first instance on appeal. Nonetheless, some effort could have been made to explain to the Supreme Court Jackson's position. At a minimum it was disingenuous for appointed appellate counsel to tell this court he did not file a reply brief solely because there was "nothing new" in the State's answering brief.

## 2. Jackson must show prejudice

There is little question that appointed appellate counsel's performance was poor, if not substandard. The second prong of *Strickland* ordinarily requires Jackson to show prejudice. Jackson contends however, he is not required to do so because of the United States Supreme Court's decision in *Cronic v. United States.*[30]

In *Cronic* the Supreme Court noted that where there is a complete failure of representation prejudice may be presumed under *Strickland.* For the most part courts have generally declined to apply *Cronic* to claims of ineffective appellate counsel even when appellate counsel has made a serious mistake. Rather, *Cronic* has been applied in the appellate court context only when counsel's failure has served to deprive the defendant of an appeal.[31] Poor presentation or selection of arguments on appeal is not the sort of shortcoming

---

[30] 466 U.S. 884 (1988).
[31] *Flick v. Warren*, 2009 WL 3698547*24 (E.D.Mich.) ("[M]any courts have declined to apply *Cronic* to appellate counsel errors which, although serious, do not deprive a defendant of his right to appeal.").

23

which the Supreme Court envisions would fall within *Cronic.* In *Penson v. Ohio,*[32] an appellate lawyer in a state criminal proceeding was allowed to withdraw before the state appellate court determined whether there was any merit to the appeal. After counsel withdrew the appellate court determined there were potentially meritorious arguments to be made. Rather than re-appoint counsel or appoint new counsel for the defendant, the appellate court simply decided the arguable issues against defendant. The United States Supreme Court held that this amounted to a complete denial of counsel and therefore, the defendant need not show prejudice in order to make out a Sixth Amendment claim. Of importance here is the manner in which the Supreme Court distinguished the case before it from cases such as this where counsel made a poor argument:

> Finally, it is important to emphasize that the denial of counsel in this case left petitioner completely without representation during the appellate court's actual decisional process. This is quite different from a case in which it is claimed that counsel's performance was ineffective. As we stated in *Strickland,* the "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." Our decision in *United States v. Cronic,* likewise, makes clear that "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." Similarly, *Chapman* recognizes that the right to counsel is "so basic to a fair trial that [its] infraction can never be treated as harmless error." And more recently, in *Satterwhite v. Texas,* we stated that a pervasive denial of counsel casts such doubt on the fairness of the trial process, that it can never be considered harmless error. Because the fundamental importance of the assistance

---

[32] 488 U.S. 75 (1988).

of counsel does not cease as the prosecutorial process moves from the trial to the appellate stage, the presumption of prejudice must extend as well to the denial of counsel on appeal.

Jackson's contention that his appointed appellate counsel's performance amounts to a complete failure of representation is contradicted by Jackson's allegations of specific departures from the accepted norm. In *Bell v. Cone*[33] the United States Supreme Court drew the distinction between a complete failure of representation under *Cronic* and something less than a complete failure of representation for purposes of the second prong of the *Strickland* test:

> When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete. We said "if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing." Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic,* this difference is not of degree but of kind.[34]

The court holds, therefore, that *Cronic* is inapplicable here and that Jackson must show prejudice resulting from his appointed appellate counsel's failures.

### 3. Jackson has not shown prejudice

In order to show prejudice Jackson must show that there is a reasonable likelihood that, had he been represented by competent counsel, the Supreme

---

[33]   535 U.S. 685 (2002).
[34]   *Id.* at 687.

Court would have reached a different result. Implicit in this, of course, is that Jackson must show a likelihood the Supreme Court was wrong. Jackson's arguments to this effect are procedurally barred and also substantively flawed.

### a. Jackson's prejudice argument is procedurally barred.

In Jackson's direct appeal, the Supreme Court rejected his argument that he was prejudiced by the joinder of the charges against him. The Court ruled:

> We next consider whether joinder would have created sufficient prejudice that the Superior Court *should* have severed the charges. Although Jackson recites the factors for determining prejudice under *Weist v. State*, he has not articulated any specific reasons why joinder of the offenses caused him prejudice. The record does not reflect any specific prejudice to Jackson either.[35]

Jackson argues that if his appellate counsel had been competent he could have articulated specific prejudice. According to Jackson, he was specifically prejudiced by the joinder because the jury could have accumulated evidence from one burglary, where he was essentially caught red-handed, with the "very little" evidence of the other two burglaries.

As noted in connection with the court's assessment of trial counsel's performance, the failure of appointed counsel to make a better argument, does not amount to ineffective assistance of counsel. Moreover, the substantive argument that Jackson was prejudiced by the joinder is foreclosed by the

---

[35] *Jackson v. State*, 990 A.2d 1281, 1287 (Del. 2009).

Supreme Court's opinion that "the record does not reflect any specific prejudice to Jackson either."

The Supreme Court's independent determination that the "record does not reflect any specific prejudice to Jackson" forecloses Jackson's argument that there was, in fact, specific prejudice. As discussed earlier in this opinion, Rule 61(i)(4) bars reargument of issues already decided. Jackson does not, and cannot, show any new legal or factual developments. At best he presents a refinement of his earlier argument to this court and the Supreme Court. This does not give rise to an exception to Rule 61 (i)(4):

> We have stated that "[i]n order to invoke the 'interest of justice' provision ... a movant must show that subsequent legal developments have revealed that the trial court lacked the authority to convict or punish [the defendant]." In *Weedon v. State,* we stated that the 61(i)(4) bar does not apply when the previous ruling was "clearly in error" or when "there has been an important change in circumstances, in particular, the factual basis for the issue previously posed." We will not reconsider an issue simply because a defendant has "refined or restated" a claim.[36]

Consequently Jackson's efforts to show prejudice are foreclosed by Rule 61(i)(4).

### b. Jackson's seizure claim

This court is also foreclosed by Rule 61(i)(4) from considering whether Jackson was prejudiced by the appointed appellate counsel's failure to argue state constitutional grounds for the seizure claim. Reviewing the police seizure

---

[36] *Pringle v. State*, 2013 WL 1087633 *3 (Del. Supr.)

27

of evidence.  As noted previously, Jackson contends that, under the Delaware constitution, Jackson was seized the moment the police made a show of authority over him.  Presumably this means when the officer turned on his overhead blinkers and siren.  According to Jackson, the Delaware constitution is more strict than the Fourth Amendment as to when a seizure occurs.  He theorizes that the police did not have authority under the state constitution to stop him when the officer turned on his lights and siren.  Consequently, according to Jackson, all of the items later seized from his person should have been suppressed.

The Supreme Court rejected Jackson's argument under the Fourth Amendment, writing:

> Having considered the totality of the circumstances, we conclude that the record reflects that the police had probable cause to lawfully arrest Jackson. Accordingly, the Superior Court properly denied the motion for suppression of the items the police discovered on Jackson's person during their search incident to his lawful arrest.

Although, as Jackson states, the Delaware constitution imposes a stricter standard than the Fourth Amendment as to when a stop occurs, his claim is still barred because it is a refinement of his earlier search and seizure claim.  It is undoubtedly true that the state constitutional claim, with its different standards, was never presented.  Still, in the scheme of things, it is a refinement of his search and seizure claim and is, therefore, procedurally barred.  The Supreme Court's holding in *State v. Wright*[37] serves to illustrate

---

[37] 67 A.3d 319 (Del. 2013).

this point. *Wright* involved a Rule 61 proceeding two decades after Wright was convicted of capital murder. During the investigation, Wright made a confession to police. The admissibility of that confession was contested at several junctures. In 2012, this court held that the *Miranda* warnings given to Wright were materially deficient and, therefore, that confession should be suppressed. On appeal the Supreme Court held that Wright's *Miranda* argument was procedurally barred, even though it had never before been considered. The Supreme Court reasoned that other arguments about the admissibility of Wright's confession had been previously considered and rejected and therefore the argument about the wording of the warnings actually given to Wright were a refinement of the earlier arguments and were therefore procedurally barred. By the same token, even though Jackson's state constitution argument has never been expressly presented, it is a refinement of his earlier search and seizure argument which was rejected. Consequently, it is barred.

### Conclusion

For the foregoing reasons Jackson's motion for post conviction relief is **DENIED.**

_____

September 3, 2014                               John A. Parkins, Jr.

oc:     Prothonotary

cc:     Andrew J. Vella, Esquire, Wilmington, Delaware - Attorney for the State
        Natalie S. Woloshin, Esquire, Wilmington, Delaware – Attorney for the Defendant

29